PALM BEACH LIQUORS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54099.    Filed October 23, 1958.

*Benjamin Alpert, Esq.,* and *John E. Mahoney, Esq.,* for the petitioner.

*W. Preston White, Jr., Esq.,* and *Robert O. Rogers, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in taxes as follows:

| Fiscal year ended June 30— | Income tax | Declared value excess-profits tax | Excess profits tax |
|---|---|---|---|
| 1943 | $64.43 | | |
| 1944 | 659.71 | | |
| 1945 | | | $3,042.34 |
| 1946 | 1,442.72 | $832.53 | 5,123.39 |
| 1948 | 141.71 | | |

The petitioner filed claims for refund and alleges overpayments of taxes as follows:

| Fiscal year ended June 30— | Income tax | Excess profits tax |
|---|---|---|
| 1943 | $2,080.27 | |
| 1944 | 2,558.16 | |
| 1945 | | $43,311.30 |
| 1946 | | 5,449.92 |
| 1948 | 79.98 | |

The issues are as follows: (a) Whether there was made on behalf of the petitioner in the taxable year ended June 30, 1943, payments for whisky in the amount of $63,700 in excess of O. P. A. ceiling prices, entitling the petitioner to an increase in cost of goods sold; (b) whether the petitioner is entitled to increase equity invested capital, for excess profits credit purposes, on account of such claimed overceiling payment as representing contribution to capital by the stockholders; (c) whether expenditures made in the operation of a farm camp are deductible as ordinary and necessary expenses of the business of the petitioner; and (d) whether the petitioner is entitled to a deduction of $3,996.27 for the taxable year ended June 30, 1946, on account of food and whisky consumed by the petitioner's representatives and business guests. The resulting effect of the decision of these issues upon the amount of net operating losses and unused excess profits credits is also involved.

### FINDINGS OF FACT.

The petitioner is a corporation organized in June 1941 under the laws of the State of Florida, and maintains its principal office and place of business at Palm Beach, Florida. It filed its income and declared value excess-profits tax returns and its excess profits tax returns for the years here involved with the collector of internal revenue for the district of Florida.

The petitioner was organized to engage in the retail liquor business. It operated over 30 separate establishments in Florida, including bars, restaurants, and retail package liquor stores. The capital stock of the petitioner throughout the period here involved was owned 25 per cent each by Berlin Griffin, George K. Yetter, and H. Halpine

Smith (and/or their respective wives). The other 25 per cent was owned by Henry C. Richardson for a part of the period, but later one Wall acquired some portion or all of Richardson's interest. Richardson was the manager in general charge of the operations of all the establishments, each of which had its own individual manager. Griffin handled the operations having to do with liquor. Smith and Yetter were not actively engaged in the conduct of the business.

Smith, Yetter, and Griffin were engaged in other ventures together, namely, a partnership operating under the name of Palm Beach Distributors which was in the wholesale liquor business, two construction businesses, one a partnership under the name of Smith, Yetter & Griffin and the other a corporation, Smith & Yetter, Inc. Other interests included two hotel operations, other real estate holdings, and a corporation, Berlin Griffin, Inc., which operated retail stores. Smith and Yetter devoted their time to the construction business.

During World War II whisky was in short supply and the allotments by the whisky suppliers to the petitioner's retail stores were insufficient to meet their needs, and consequently the petitioner was desirous of obtaining additional whisky. Griffin was advised that one Sam Friedman of Louisville, Kentucky, had a supply of bulk whisky for sale. About March 1943, Griffin, accompanied by Smith, made a trip to Louisville and negotiated with Friedman for the purchase of 640 barrels of bourbon whisky at a price which would include payment of an amount of $100 per barrel in excess of O. P. A. ceiling prices.

The petitioner did not have adequate cash resources to meet the purchase price of this large quantity of bulk whisky. A check for $10,000 drawn on the petitioner's bank account in favor of Griffin was cashed on March 17, 1943, and Griffin, Yetter, and Smith raised the remainder of the required sum of money by drawing on various accounts of their other businesses and ventures, including the Smith, Yetter & Griffin construction account, and a brokerage account. Richardson had no funds and therefore furnished no part of the money. A cashier's check for $30,780.23 was then purchased on March 17, 1943, drawn in favor of Sam Friedman. Griffin went again to Louisville accompanied by Smith and purchased the 640 barrels of whisky, giving therefor the cashier's check for $30,780.23, on the O. P. A. ceiling price, plus $63,700 in cash, representing overceiling payments. In return Friedman gave Griffin warehouse receipts for the 640 barrels of whisky. An additional payment on the original purchase price was made to Friedman by the petitioner by cashier's check in the amount of $1,452.87, which was entered on petitioner's books June 17, 1943.

The petitioner also acquired 5 additional barrels of whisky from another source.

The petitioner did not have a wholesale whisky permit and, in order to comply with legal requirements, it engaged Standard Wine & Spirits Co., Inc., which had a wholesale permit, to clear the whisky and to arrange to have it bottled. The petitioner paid that company in April 1943 the amount of $4,357.40, to cover the cost of clearing and handling the whisky at $1 per barrel and to cover certain taxes. In April there was also paid directly to James B. Beam Company net amounts totaling $75,247.46 for bottling the whisky. Other expenditures totaling $6,585.77 were made in connection with this whisky. This was all paid by the petitioner from its bank account, except $30,000 which was paid by the individuals, Smith, Yetter, and Griffin.

The purchase of the 640 barrels of whisky from Friedman was recorded on the petitioner's books at the ceiling price. At no time was the overceiling payment ever recorded on its books. The expenses with respect to bottling, handling charges, and taxes were recorded on its books.

Of the total of 645 barrels, only 250 barrels were bottled, and this made 4,252 cases. Of this number of cases, 1,368½ were distributed among the petitioner's bars and liquor stores, 359 were sold to Standard Wine & Spirits Co., and the remaining cases were sold through Standard Wine & Spirits Co. to two other concerns, or were exchanged for other types of whisky.

The petitioner deposited in its bank account a total of $74,515.77 received from sales of this whisky to and through Standard Wine & Spirits Co. and recorded such receipts on its books. By selling and exchanging this whisky among Standard Wine & Spirits Co. and the other two concerns, the petitioner was thereafter able to obtain increased allotments of liquor from such sources.

Upon distribution of the 1,368½ cases among its retail establishments, the petitioner made memorandum entries of the sales at the retail O. P. A. sales price, aggregating $43,445.50. These sales were not reflected in actual sales until such time as the whisky was actually sold by the retail stores.

The reason the petitioner's officers decided to cease bottling this whisky was that Griffin learned of an investigation being undertaken by the Alcohol Tax Unit of sales of this whisky by Friedman at overceiling prices. Griffin approached Friedman and sought to have him take back the warehouse receipts covering the unbottled whisky and use them elsewhere. Friedman was able to find another purchaser, Dominic A. Olivo, for the remaining 395 barrels of whisky, for a price including an overceiling payment of $26,000. This was less than the overceiling price originally paid by Griffin upon the purchase of the whisky from Friedman, but was the best price that Friedman was able to obtain. Griffin delivered the warehouse receipts to Friedman and received directly from Olivo a check for $20,821.28,

plus $26,000 in cash. The check, representing the O. P. A. ceiling price, was deposited in the petitioner's bank account and was credited to sales. The $26,000 in cash was retained by the stockholders and was not recorded on the petitioner's books.

A criminal information was filed on October 24, 1944, in the United States District Court for the Western District of Kentucky against Friedman, Berlin Griffin, and others for violation of the Emergency Price Control Act of 1942 in selling whisky above the legally established ceiling prices. Griffin on the same date pleaded guilty to eight counts of violations and was convicted and fined $26,125.

In its income tax return for the fiscal year ended June 30, 1943, the petitioner reported net income of $9,775.59 and income tax liability of $2,080.27.

On May 16, 1952, the petitioner filed a claim for refund of the income tax paid for the fiscal year ended June 30, 1943, in the amount of $2,080.27, on the ground that it had failed to take into consideration payments made during that year for the purchase of liquor in the amount of $63,700. In such claim the petitioner computed a net loss of $54,143.16, after deducting $63,700 from the figure of $9,556.84 representing net income as found by the revenue agent.

The respondent determined a deficiency for the fiscal year 1943 in the amount of $64.43. In the notice of deficiency the respondent stated that the claim for refund for the fiscal year 1943 would be denied in the event of no appeal to this Court, with the following statement:

Consideration has been given to your claims for refund based upon the contention that over-ceiling cash payments not reflected on your books or tax returns but alleged to have been paid by Berlin Griffin in April 1943 to Sam Friedman in connection with whiskey purchased for your account should now be allowed as additional purchases not previously claimed and should also be considered a contribution to capital not previously claimed as part of your invested capital in computing your excess profits credit. It is determined that no part of the alleged over-ceiling cash payments is allowable as a reduction from total receipts in computing gross income or as a deduction from gross income in computing net income or as an addition to invested capital for purposes of computing the excess profits credit, since it has not been substantiated that: (1) any such over-ceiling payments were made, and (2) even if such payments were made, that they were made for your account and that they are includible in cost of goods sold or in invested capital.

In order to maintain inventory control over its retail establishments, petitioner operated a perpetual inventory system and charged each retail outlet for each shipment to it at the retail price. Under this method the retail value of inventory on hand, at any particular store at any time, would equal total shipments made and charged at retail to that store by the petitioner, less sales recorded by that store.

Whenever any of the petitioner's officers or its comptroller, Charles T. Eaton, or its manager Henry C. Richardson, purchased or consumed any food or liquor at any of the petitioner's retail establishments, or entertained business guests at such establishments, such officer or employee would customarily sign a tab for the charge, which was made at the regular retail price. Any such charge was recorded on the petitioner's books as a sale, with a corresponding charge to accounts receivable from such officer or employee. Actually these charges were not considered as being owed by the individuals. Rather they were treated as having been incurred in promotion of the petitioner's business, and at the end of the year were eliminated from accounts receivable. Fifty per cent of such charges were deemed cost. Inasmuch as 50 per cent of the price charged at retail had been reflected on the books as profit, a charge was made to cost of sales in the amount of one-half the gross amount of these accounts receivable, thus in effect eliminating the artificial profit, and the remaining one-half was charged off and deducted as entertainment and promotion expense. This system of charging was necessitated by the inventory control system used by the petitioner.

The amounts charged in this manner to accounts receivable in the fiscal year ended June 30, 1946, were as follows:

| | |
|---|---:|
| Berlin Griffin | $904. 18 |
| H. Halpine Smith | 259. 57 |
| C. T. Eaton | 282. 10 |
| Henry C. Richardson | 1, 237. 66 |
| Not specified | 1, 312. 76 |
| | 3, 996. 27 |

Consistent with the general accounting treatment above described, the petitioner, in its return for the fiscal year 1946, increased the cost of goods sold by one-half of such aggregate amount and deducted the remaining one-half as business expense, namely, "Sales Promotion."

In the notice of deficiency the respondent restored to net income for the fiscal year 1946 the full amount of $3,996.27 with the following statement:

It is determined that entertainment and promotion expenses in the amount of $3,996.27, one-half of which amount was deducted as warehouse purchases and the balance as entertainment and promotion expenses, are not ordinary and necessary expenses and are not deductible under the provisions of section 23 of the Internal Revenue Code.

The effect of the respondent's determination was to tax the petitioner upon the artificial profit of one-half of $3,996.27, and to disallow the claimed deduction of one-half of such amount.

One-fourth of the amount of $3,996.27 represents cost of merchandise consumed in the fiscal year 1946 by officers and employees of the

petitioner and business guests, in connection with promotion of business of the petitioner.

During the fiscal years 1945 to 1948, inclusive, the individuals, Smith, Yetter, Griffin, and Richardson owned a so-called fishing camp consisting of a ranchhouse on 20 acres of land located on Lake Okeechobee about 100 miles from Palm Beach. During such years they permitted the petitioner to use this camp for the purpose of supplying food for the petitioner's five restaurants and dining places. During the war it was necessary that the petitioner produce some of its own food supplies because of food rationing. The petitioner paid no rent for the use of this property, but did incur certain maintenance and operation expenses in connection therewith.

The petitioner employed a man and his wife to operate the ranch. Thousands of chickens were raised, some being incubated and others purchased as baby chicks. In addition eggs were produced. Cattle were purchased, fattened, and slaughtered for beef. The farm contained chicken houses, incubators, refrigerators, scales, etc. At times when operations required it, additional help was engaged. The poultry, eggs, and meat produced at this farm camp were delivered weekly or oftener by truck to the various dining places operated by the petitioner.

Expenditures made by the petitioner in connection with this operation included salaries and wages, groceries, gasoline, oil, truck repairs, chicken feed, and various repair and maintenance items. The totals expended during the fiscal years 1945 to 1948, inclusive, were as follows:

| Fiscal year | Amount |
| --- | --- |
| 1945 | $2, 434. 49 |
| 1946 | 7, 367. 75 |
| 1947 | 6, 766. 06 |
| 1948 | 710. 34 |

The above-listed amounts were deducted by the petitioner in its returns as ordinary and necessary business expenses, but were disallowed by the respondent.[1]

The amounts above set forth constituted ordinary and necessary business expenses of the petitioner.

OPINION.

The primary issue is whether, for its fiscal year ended June 30, 1943, the petitioner is entitled to increase its cost of goods sold in any

---

[1] The respondent did not determine a deficiency for the fiscal year 1947, and that year is not involved except insofar as is necessary to determine a possible unused excess profits credit for that year for the purpose of carryback in computing tax liability for other years which are in issue.

amount representing price paid for whisky in excess of the O. P. A. ceiling price.

The respondent contends that no such overceiling payment was made, but that if it was, it was made by the stockholders of petitioner in their individual capacities and not on behalf of the petitioner.

Two witnesses for the petitioner, Griffin and Smith, who were stockholders, testified in detail concerning a trip to Louisville and the making of an overceiling payment in cash. Griffin testified that the amount paid was $100 per barrel, or $63,700. Smith corroborated the fact that such an overceiling payment was made, but could not remember the precise amount, although he remembered a payment of approximately $60,000. We are satisfied from the testimony that this payment was made as alleged and have so found as a fact. The respondent alternatively contends that in any event the amount of $63,700 should be reduced by an amount of $26,000, which the stockholders received upon a disposition of 395 barrels of the same liquor. On brief the petitioner "recognizes that the $26,000 retained by the stockholders represents a reduction in the over-ceiling purchase cost of $63,700."

We are also satisfied that this net amount of $37,700 was expended on behalf of the corporation. At the time of purchase the petitioner did not have the necessary cash and consequently paid out of its own funds only $10,000 of the O. P. A. ceiling price of approximately $30,000, the remainder being paid by the stockholders. Yet the full amount of such ceiling price was recorded on petitioner's books and was not questioned by the respondent. Other expenses and costs in connection with this particular whisky were paid by the petitioner and were recorded on its books. Furthermore, proceeds from sales of the whisky were deposited in the petitioner's bank account and were recorded on petitioner's books as its sales.

Under the circumstances, we conclude that a net overceiling price of $37,700 was paid on behalf of the corporation and should be included in the cost of goods sold.

The respondent determined deficiencies in excess profits tax for the fiscal years 1945 and 1946. The petitioner alleges that in the computation of its excess profits credit for those years, as well as for the purpose of computing the unused excess profits credit carryover from the fiscal years 1943 and 1944 and possible carryback from its fiscal year 1947, it is entitled to the benefit of the inclusion in equity invested capital of the amount of $63,700. The petitioner claims that this

amount constituted either money or property paid in as a contribution to capital within the meaning of section 718, I. R. C. 1939.[2]

The respondent, on the other hand, denies that the petitioner is entitled to this inclusion in equity invested capital. In the notice of deficiency the reason stated was that the expenditure had not been made, but that if made, it was not made on behalf of the petitioner. In the alternative, he contends that the amount includible is to be limited to $37,700, because of the retention by the stockholders of the overceiling rebate or receipt of $26,000.

The petitioner has adduced evidence which, as stated above, satisfies us that a net amount of $37,700 was paid on behalf of the petitioner. We consider this tantamount to a payment by the stockholders to the petitioner and an expenditure by the petitioner of that amount in the purchase of the whisky. On brief the respondent also argues that it has not been shown whether the payment was intended as a loan or as a contribution to capital, or whether it was ever repaid. He points to the fact that one of the stockholders, Richardson, did not furnish any part of this payment. However, considering the issue as presented in the notice of deficiency, in the pleadings, and at the hearing, we are satisfied from the evidence that the petitioner should prevail on this point. Griffin testified in effect that the payments constituted investments in the corporation, and that although Richardson had no money the other three stockholders decided that they would put up the money for Richardson's investment because of his value to the enterprise and the value of licenses which he had previously obtained.

The respondent on brief further states that the date of payment has not been shown and that it is therefore impossible to determine average daily invested capital as required by section 717. While the

---

[2] SEC. 718 (a). DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

(1) MONEY PAID IN.—Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital ;

(2) PROPERTY PAID IN.—Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined under the law applicable to the year of disposition, but without regard to the value of the property as of March 1, 1913. If the property was disposed of before March 1, 1913, its basis shall be considered to be its fair market value at the time paid in. If the unadjusted basis of the property is a substituted basis, such basis shall be adjusted, with respect to the period before the property was paid in, by an amount equal to the adjustments proper under section 115 (l) for determining earnings and profits ;

*       *       *       *       *       *       *

(6) NEW CAPITAL.—An amount equal to 25 per centum of the new capital for such day. The term "new capital" for any day means so much of the amounts of money or property includible for such day under paragraphs (1) and (2) as was previously paid in during a taxable year beginning after December 31, 1940 * * *

precise date of payment has not been shown, we do know that a cashier's check was purchased on March 17, 1943, and that Griffin and Smith gave this check and cash to Friedman in Kentucky. The evidence indicates no substantial delay in this payment. If there was a short delay in payment, the effect on the computation would be *de minimis*. We think the date of payment should be considered March 17, 1943.

As indicated hereinabove, we think the result of the transactions was a net contribution by the stockholders of $37,700. This amount is to be included in equity invested capital for purposes of calculation of the excess profits credit for the fiscal years 1945 and 1946 and in the computation of any unused excess profits credit which may be carried forward from the fiscal years 1943 and 1944 and carried back from the fiscal year 1947.

It should be added that neither party raises any questions whatever as to any considerations of public policy in connection with the tax effects of the inclusion of the amount of the overceiling payment in cost of goods sold or in equity invested capital.

The petitioner also contends that the respondent, in determining net income for the fiscal year 1946, erred in his treatment of an aggregate amount of $3,996.27 which had been charged on the petitioner's books to accounts receivable from its officers and employees.

We have described in the Findings of Fact the petitioner's inventory control system pursuant to which items consumed in its retail establishments by its officers and employees or business guests were reflected on petitioner's books as ordinary sales resulting in profit in the amount of 50 per cent thereof. Inasmuch as these accounts receivable were not in fact such and were not intended to be paid by such officers, it is obvious that the petitioner did not derive profit from this source. In its return the petitioner made adjustments to its cost of goods sold to eliminate such artificial profit. The result of the respondent's determination was to restore such profit. This action of the respondent was clearly erroneous.

The remaining 50 per cent of this amount of $3,996.27 represented the actual cost of the merchandise consumed. The petitioner treated this cost as a deductible item representing promotional expense in its business. The respondent has disallowed this amount as a deduction. The burden of proof upon this issue is upon the petitioner to show that the amount of $1,998.13 is an ordinary and necessary expense of its business. The record in this respect is woefully deficient. Only two witnesses testified. The accountant testified but did not have personal knowledge of the circumstances giving rise to these charges. Griffin testified that persons from New York and other places were entertained with the view to obtaining from such persons better allo-

cations of merchandise. None of the other parties to whom charges were made testified. Hence, we cannot find that all of this amount of $1,998.13 constituted ordinary and necessary expense of the petitioner's business. For all that appears in the record some portion may represent merchandise consumed merely for personal reasons of the officers or employees or in furtherance of their separate business activities. On brief the petitioner argues that since there is testimony to the effect that approximately 90 per cent of the aggregate amount involved was expended at retail establishments located in Fort Pierce and Clewiston, which are more than 50 and 80 miles, respectively, from petitioner's headquarters in Palm Beach, such amounts must be considered as expenses incurred in carrying out the duties of these individuals for the petitioner while they were away from their homes and the principal place of the petitioner's operation. However, there is no evidence whatsoever upon which we can conclude that the full amount was expended by the officers and employees in carrying out their duties. Nevertheless, we are satisfied from the testimony that the officers and employees did entertain persons in connection with business of the petitioner. Under the circumstances, we have exercised our best judgment and have concluded and found as a fact that one-half of $1,998.13, or $999.07, represents the cost of goods which were consumed in the furtherance of the business of the petitioner. Such amount of $999.07 constitutes an allowable deduction as ordinary and necessary business expense.

For each of the fiscal years 1945 to 1948, inclusive, the respondent determined that the amounts expended by the petitioner in operating a farm camp did not constitute ordinary and necessary business expenses. Apparently the respondent does not question the fact that the claimed amounts were expended by the petitioner. In any event, the evidence establishes that such amounts were expended and we have so found as a fact. While the respondent did not, in the notice of deficiency, specify his reasons for the disallowance, it would appear from the briefs that he considered the expenditures as having been made on behalf of the stockholders instead of in furtherance of the petitioner's own business, largely because of the fact that the camp was owned by the stockholders individually. However, the evidence adduced by the petitioner establishes that the reason for the payments by the petitioner was to produce supplies of food for its restaurant operations. The camp was on occasion also used for entertainment of business guests of the petitioner. We are satisfied from the evidence that the very infrequent use of the camp by the individuals for their own pleasure was merely incidental and that the expenditures in question were not made for the benefit of such individuals. We hold that the amounts in question are properly deductible as ordinary and necessary business expenses of the petitioner.

There are issues raised as to the right of the petitioner to carrybacks and carryovers of net operating losses and unused excess profits credits, as adjusted in accordance with decisions on specific issues presented herein. On brief the respondent contends that petitioner has not shown that any net operating loss for the fiscal year 1943 or any unused excess profits credits for the fiscal years 1943 and 1944 were not absorbed in carrybacks to the fiscal year 1942, a year which is not in issue. However, we note that in connection with the determination of the deficiencies involved herein, the respondent made certain determinations with respect to the fiscal year 1942, including a determination that there was a net operating loss for that year. The respondent also contends on brief that petitioner has not shown the right to a carryback of an unused excess profits credit from the fiscal year 1947, a year which is not in issue, to the fiscal year 1945. Here again, in the notice of deficiency for the years in question reference is made to certain determinations made by the respondent with respect to the fiscal year 1947. It thus appears that the proper amounts of carryovers and carrybacks from the fiscal years 1942 and 1947 can be computed, based upon the determinations of the respondent for those years, adjusted as required by the decisions herein. The necessary computations will be made in connection with the recomputation under Rule 50. See section 710 (c) of the Internal Revenue Code of 1939 in connection with the computation of any amount of carryback of unused excess profits credit from the fiscal year 1947.

*Decision will be entered under Rule 50.*