**GREENE–HALDEMAN, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 16568.

United States Court of Appeals
Ninth Circuit.

Sept. 21, 1960.

Rehearing Denied Dec. 9, 1960.

885

John Y. Merrell, Washington, D. C.,
Austin H. Peck, Jr., Los Angeles, Cal.,
Watkins, Lund & Peck, Los Angeles, Cal.,
of counsel, for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee
A. Jackson, Harry Baum, Rita E. Houser,

Attorneys, Department of Justice, Washington, D. C., for respondent.

Before STEPHENS and POPE, Circuit Judges, and CROCKER, District Judge.

CROCKER, District Judge.

This is a petition for review of a decision by the Tax Court, which upheld a determination of deficiency made by the Commissioner [Greene-Haldeman v. Commissioner, 1959, 31 T.C. 134] involving Greene-Haldeman's (i. e. "taxpayer's") fiscal years 1949 through 1952. Jurisdiction is vested in this Court by virtue of the provisions of Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

For purposes of this opinion the pertinent facts may be summarized as follows:

Taxpayer is a California corporation with its principal place of business in Los Angeles, California. During the period here involved, it was a large Chrysler-Plymouth automobile agency. It engaged in the usual dealer's enterprises, including the sale of new and used cars, parts and services, as well as automobile finance and insurance services.

In addition, the taxpayer also rented some cars for various periods prior to their sale as used cars; these rentals were of both a short-term and long-term variety (i. e., by short-term rentals we mean rentals by the day, week, etc.; by long-term rentals we mean leases for a period of one or two years). The taxpayer entered the short-term rental business prior to 1945 and the long-term rental business in August, 1949. The Chrysler Corporation rules under which the taxpayer acquired rental vehicles from the manufacturer prohibited the taxpayer from selling such vehicles outright as new cars, but no prohibition was placed on the sale of short-term rentals after six months or on the practice of giving a lessee an option to purchase after 12 months' use. In fact, long-term lessees were customarily given such options which could be exercised at the end of the lease term.

The reason for the above-mentioned Chrysler Corporation rules was that during the period here involved new cars were being distributed to dealers under quotas instituted to cope with an abnormal demand evidently caused by such factors as a dearth of cars subsequent to World War II, the advent of the new 1949 models, and scarcity fear brought on by the Korean conflict. Chrysler Corporation in adopting these rules was attempting to prevent the circumvention of quotas by dealers who were provided vehicles for strictly rental purposes. Because the taxpayer expanded its car rental business during the period here involved it was able to obtain a total of more new cars than would have been made available to it under its dealership allotment. The inference the Commissioner wanted the Tax Court to draw, and which the Tax Court apparently drew, from the above state of facts was that the taxpayer through its "long-term rental with option to purchase plan" was really operating a "credit purchase plan" under a different name, and that one of the taxpayer's primary motives in obtaining autos for short-term rentals was for subsequent sale, and therefore the taxpayer held them "primarily for sale to customers in the ordinary course of his trade or business."

Both short and long-term rental vehicles were depreciated by taxpayer. When it was determined that a vehicle should be retired, the vehicle was transferred to the taxpayer's used car division and either retailed or wholesaled in accordance with taxpayer's procedures. Likewise, when a long-term lessee exercised his option to purchase, the sale was characterized as a used car department transaction. The income resulting from the disposal of all rental vehicles (i. e., the difference between the depreciated cost of the vehicles and the amount received from the sale, after making allowances for selling expenses) has been reported by the taxpayer as income entitled to capital gain treatment.

We are being asked to decide if income from the sale of the above-described

rental vehicles is taxable as ordinary income or is entitled to capital gain treatment. The specific question presented for determination is: Did the Tax Court err in determining that the above-described rental vehicles owned by the taxpayer were held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of Section 117(a) and (j) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117 (a), (j)?

The term "primarily" as it is used in Section 117(j)(1)(B) exception to capital gain treatment of property used in the trade or business (i. e., "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business") has been construed by this Court as meaning "substantial" or "essential" rather than "principal" or "chief". See Rollingwood Corp. v. Commissioner of Internal Revenue, 9 Cir., 1951, 190 F.2d 263. Cf. S. E. C. Corp. v. United States, D.C.S.D. N.Y.1956, 140 F.Supp. 717, affirmed 2 Cir., 241 F.2d 416.

The taxpayer, however, contends that the Tax Court erred to the extent that it relied on the following factors in determining that vehicles were held "primarily [i. e., substantially] for sale to customers in the ordinary course of his trade or business."

■ First, taxpayer argues that error was committed to the extent the purpose for which the property was held *at the time of sale* influenced the decision of the Tax Court. The Tax Court concluded that the taxpayer "acquired, held and sold the rental cars with the primary, essential, substantial and determining business purpose of selling them to its customers in the ordinary course of its business." This language, in our opinion, does nothing more than indicate that the taxpayer had as one of its primary purposes the ultimate sale of these cars to its customers in the ordinary course of its business at the time it acquired the property, and that this intention continued, unaltered, while the cars were being rented and later held until customers purchased them. The language of the Tax Court does no more than demonstrate a continuous purpose as opposed to those situations where a taxpayer may acquire property for one purpose and later hold, use or dispose of it for another purpose. In fact, in the course of the Tax Court's opinion it is stated "[taxpayer's] acquisition, holding and sale of these rental automobiles were accompanied by the everpresent motive of ultimately selling them at retail for profit."

■■ Second, the taxpayer maintains that the sale of used rental vehicles is a normal, necessary and ultimate phase of the rental cycle, that it is forced by competition to dispose of its vehicles when they are no longer commercially valuable for rental purposes. Consequently, taxpayer contends that the Tax Court erred in concluding that the taxpayer held the vehicles primarily for sale to the extent that it considered (1) the taxpayer's sales activity, and (2) the frequency, continuity and substantiality of sales, and the proximity of sales to purchases. In this regard the taxpayer also argues that it should not be penalized (by treating gain on sales as "ordinary income") merely because it uses its existing used car outlets to get the highest price for these former rental vehicles. As to the taxpayer's sales activity it is our opinion that although the mere disposal of such vehicles is a normal and necessary phase of the rental business, the active prosecution of such sales is not. The extent of sales activity on the part of the taxpayer is relevant to the issue of whether the taxpayer is holding these vehicles for a primary purpose other than rental. The taxpayer is not being penalized; rather its active engagement in prosecuting the sale of former rental vehicles is one factor which is relevant in determining if it is holding such vehicles primarily for the purpose of sale to customers in the ordinary course of its trade or business. Cf. Palos Verdes Corp. v. United States, 9 Cir., 1952, 201 F.2d 256. In regard to the "frequency, continuity and substantiality of sales," and the "proximity of sales to

purchases" the Tax Court, after listing a number of criteria which included "frequency, continuity and substantiality of sales," and "proximity of sales to purchases" stated: "All of these criteria should be considered; no single factor can be viewed as dispositive, S. E. C. Corp. v. United States, supra." The only other indication that the Tax Court relied on' these criteria in the case at bar is found further in the opinion where it is stated: "[Taxpayer's] sales of rental cars were frequent, continuous and substantial. They were a part of the everyday operation of a (that) business." In our opinion this language merely indicates that such factors are relevant but not determinative. The degree of relevancy is questionable in that one who is strictly in the business of renting automobiles might have a turnover comparable to the taxpayer and yet not be found to be "in the business" of selling such used rental vehicles, but the taxpayer's contention that these factors should not have been considered at all, is without merit. Sales activity, the frequency, continuity and substantiality of sales, and the proximity of sales to purchases are factors which are relevant in determining if one who rents autos is primarily engaged in the sale of autos to customers in the ordinary course of business, and consequently the Tax Court's consideration of these factors was proper.

■ The taxpayer next contends that the Commissioner's allowance of claimed depreciation deductions for the period during which the cars were being rented precludes a finding that after termination of the rental period cars were held primarily for sale to customers. Our answer to this contention is that the language of Section 117(j) contemplates that depreciable property used in a business *may* also be held primarily for sale —and that consequently the profits on sale are not to be accorded preferential capital gain treatment—where the depreciable articles, after having been used, are actively sold on a frequent and recurrent basis and in such a manner that it could be concluded that a primary purpose for which they were held was sale to customers in the ordinary course of a trade or business. Indeed, the use of the word "primarily" in Section 117(j)(1)(B) itself indicates that the property sold could have been held for more than one purpose. See Rollingwood Corp. v. Commissioner, supra. In Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, at page 52, 76 S.Ct. 20, at page 24, 100 L.Ed. 29 the Court indicated that a narrow construction should be given to provisions of the Code which authorize capital gain treatment. If we were to accept the taxpayer's contention we would of necessity be expanding the types of transactions which are entitled to capital gain treatment.

■■ Whether property used in the taxpayer's trade or business is held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of Section 117(a) and (j) of the Internal Revenue Code of 1939 is essentially a question of fact. Rubino v. Commissioner, 9 Cir., 1951, 186 F.2d 304, certiorari denied 342 U.S. 814, 72 S.Ct. 28, 96 L.Ed. 615. The Tax Court as trier of fact found on the basis of relevant evidence that the taxpayer "acquired, held and sold the rental cars with the primary, essential, substantial and determining business purpose of selling them to his customers in the ordinary course of its business." Regardless of whether we are bound by the so-called "clearly erroneous" rule expressed in Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., or whether we are entitled to follow a more liberal rule of review of the findings, we, after reviewing all the evidence presented to the Tax Court, adopt the Tax Court's ultimate finding that the taxpayer acquired, held and sold the rental cars with the primary, essential and substantial business purpose of selling them to its customers in the ordinary course of its business.

The question of whether a taxpayer who rents vehicles and subsequently sells them can be required to pay taxes on the profit from the sale at "ordinary income"

rates has not been decided by this court, but see Evans v. C. I. R., 9 Cir., 1959, 264 F.2d 502. The question has, however, come up in other Circuits. See Philber Equipment Corp. v. Commissioner of Internal Revenue, 3 Cir., 1956, 237 F.2d 129. The Philber case is distinguishable from the case at bar in that in that case the Court considered certain facts, which do not exist in the case at bar, to be "critically significant." But, even aside from differences of fact, in view of the lack of any realization of profit by "Berman" (a separate entity with ownership interests identical to the taxpayer Philber) when it sold Philber's vehicles, we cannot agree with the Third Circuit's conclusion that "both were legitimate business enterprises, and there is no suggestion in the evidence of any lack of business purpose in the activities or relationship of the two entities."

The decision of the Tax Court is affirmed.

POPE, Circuit Judge.

I concur for the reason that I think the finding of the Tax Court that the rental cars in question were held primarily for sale to customers in the ordinary course of business was not clearly erroneous. If I were the trier of the facts here I would be inclined to find differently, at least for the later portion of the period in controversy.

For example, during petitioner's fiscal year 1952, its net income from rental constituted 94.32 per cent of its total operating profit.[1] In fiscal 1949, the rental fleet averaged only 69 cars, representing an investment of $105,711, and the net profits from rentals during that year were about $3900. By 1952, the size of the rental fleet had increased to 617 cars, an investment of $1,135,870, and the net profit from rentals had increased to $227,000.

While it may well be true that at the start of the rental operation the real reason for that operation was the acquisition of more cars for sale, yet later developments of petitioner's operations show a very different picture. Then the rental business had become the main business; this was the source of substantially all of the profits. I would say that now the business was a very different one; that by this later time the character of the business had become such that it was not materially different than the car rental operations in the cases dealt with in Massey Motors, Inc. v. United States, 364 U.S. 92, 97, 80 S.Ct. 1411, 1414, 1424, 4 L.Ed.2d 1592, 1603.[2]

But finding the facts here is not our function, and it seems to me we cannot say the Tax Court's finding was clearly erroneous. It is true that what occurred and what was done and how the business was operated is not in dispute. The basic facts were stipulated. The proper inference to be drawn from this totality of the basic facts is also a question of fact.

I disagree with the reasons given in Philber Equipment Corp. v. Commissioner, 3 Cir., 237 F.2d 129, 131, for that court's rejection of the Tax Court's find-

1. This percentage figure is taken from the Tax Court's findings which in turn were taken from the stipulation of the parties. Some question is raised whether the details of rental operating profit ($227,028.-41) could have included the gains from sale of rental cars. These were reported as $134,169.93. If this suggests a defect in the findings, the suggested defect does nothing to strengthen the Tax Court's findings. The percentage found by the Tax Court was obtained by comparing the figure above mentioned (rental operating profit) with $240,687.70, total operating profit of business. There is noth-

ing in the findings to show whether this figure does or does not include all of the gains from the sale of the nonrental cars. It sufficiently appears that the rental business initially undertaken in a tentative and relatively minor manner had during the later years here involved grown to be the major income producing portion of the whole business.

2. There the Court remarked that "the 'profits' of the taxpayers here are capital gains and incur no more than a 25% tax rate."

ing. It said: "With respect to that finding it must be noted it was in the nature of an ultimate finding of fact and since such finding is but a legal inference from other facts it is subject to review free of the restraining impact of the so-called 'clearly erroneous' rule applicable to ordinary findings of fact by the trial court * * *." The fallacy of that approach is demonstrated in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218. That opinion dealt with two cases involving the question whether a transfer of an automobile in one case, and the payment of money in the other, were gifts. The circumstances of these transfers were not in dispute. The court stated that the question for decision by the court of first instance, was "what the basic reason for [the transferor's] conduct was in fact— the dominant reason that explains his action in making the transfer." Using language which I think equally applicable in our case, the Supreme Court said: "Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. * * *

"One consequence of this is that appellate review of determinations in this field must be quite restricted. * * * Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' * * * The rule itself applies also to *factual inferences from undisputed basic facts.*" (Emphasis added.)

Hence, though I am not prepared to say with the majority, that I "adopt the Tax Court's ultimate finding", I do say that such finding is not clearly erroneous.