WILLIAM S. OUDERKIRK and BETTE D. OUDERKIRK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ouderkirk v. Commissioner
Docket No. 695-76.
United States Tax Court
T.C. Memo 1977-120; 1977 Tax Ct. Memo LEXIS 320; 36 T.C.M. (CCH) 526; T.C.M. (RIA) 770120; April 27, 1977, Filed Stephen B. Hill and Roy D. Lambert, for the petitioners. Jan R. Pierce, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $11,674.40 and $615.00 in petitioners' Federal income taxes for 1971 and 1972, respectively. Petitioners have conceded the adjustments for 1972 as determined by respondent. Therefore, the only issue remaining for our decision is whether during 1971 certain timberland sold by petitioners was a capital asset within the meaning of section 1221 [1]/ or real property used in petitioners' trade or business within the meaning of section 1231. FINDINGS OF FACT Petitioners William S. Ouderkirk and Bette D. Ouderkirk, husband and wife, were legal residents of Newport, Oregon, when their petition was filed. Their Federal income tax returns for 1971 *322 and 1972, prepared on the cash receipts and disbursements basis, were filed with the Internal Revenue Service Center, Ogden, Utah. For convenience, William S. Ouderkirk is hereinafter referred to as petitioner. For a period prior to 1961, petitioner, his father-in-law, and his brother-in-law owned all the stock in a corporation known as W.O.W. Lumber Company. Petitioner's father-in-law died, leaving petitioner and his brother-in-law in charge of the corporation. Unable to agree on how to run the corporation, they decided to liquidate it. When the corporation was liquidated, petitioner received a sawmill located on a 23-acre tract and 7,700 acres of cut-over timberland in exchange for his stock. Petitioner's brother-in-law received land on which merchantable timber was standing in exchange for his stock. Practically all of the value of the land received by petitioner on the liquidation of the corporation was attributable to the land as such. The relatively small amounts of merchantable timber standing on the land at that time were widely scattered. In the area where these lands were located, timber can be harvested on a 35-to 50-year cycle. On October 1, 1961, petitioner *323 and his wife formed a partnership known as W.O.W. Lumber Company (W.O.W.) in which each held a 50-percent interest. The assets of the partnership included the sawmill and timberland received by petitioner on liquidation of the corporation. The sawmill machinery was inefficient and obsolete. At first, petitioner did not intend to operate the sawmill, but he later employed a manager who was able to place the mill in operation. During 1962 to 1970, the following amounts were spent on machinery and equipment for the mill: 1962
$ 7,313
1963
3,082
1964
19,565
1965
147,764
1966
1,586
1967
425
1968
17,859
1969
2,613
1970
9,540
From 1961 to 1971, W.O.W.'s sawmill was supplied by three sources: (1) logs purchased at the mill from third parties; (2) logs cut from standing timber purchased from the State of Oregon and Georgia-Pacific Corporation; and (3) fir logs cut by gyppo loggers (one-or two-man logging operations) from W.O.W.'s timberland. The following table shows by years the board feet of the lumber W.O.W. processed from logs (1) purchased at the sawmill, (2) processed from purchases of standing timber, (3) processed from W.O.W.'s land, and (4) *324 the total board feet processed: From
From
Purchased
Purchased
W.O.W.
Processed Years
at Mill
Timberland
Land
at Mill
1961
539,070
357,240
896,310
1962
3,850,410
6,571,960
10,422,370
1963
3,7 71,620
2,250,520
2,316,870
8,339,010
1964
3,767,820
5,698,190
1,005,610
10,471,620
1965
3,065,980
3,409,840
1, 848,520
8,324,340
1966
3,656,450
4,175,870
203,180
8,035,500
1967
3,551,610
4,559,980
1,050,490
9,162,080
1968 5,288,870
1,802,310
1,240,980
8,332,160
1969
5,743,830
874,840
2,768,390
9,387,060
1970
3,752,440
3,014,420
6,766,860
1971
4,943,290
103,380
5,046,670
Total
41,931,390
29,343,510
13,909,080
85,183,980
The following table shows the respective percentages of timber cut from W.O.W. timberland to the respective total amounts processed by the sawmill during 1961 through 1971: Year
Percentage
1961
39.85
1962
1963
27.78
1964
9.60
1965
22.21
1966
2.53
1967
11.47
1968
14.89
1969
29.49
1970
44.55
1971
2.05
In addition to the fir logs processed through W.O.W.'s sawmill, the gyppo loggers cut some alder logs which were sold to other processors. *325 The timber that was cut from W.O.W.'s land during 1961 to 1971 was second-growth timber which had been missed when the land was logged. It was located mainly in deep canyons or other rough terrain where commercial logging was considered impractical. No timber at all was cut from approximately 75 percent of W.O.W.'s timberland during 1961 through 1971. The cutting which occurred on the remaining 25 percent of these lands was done in widely scattered areas. A good stand of second-growth timber on 40 acres will produce between 3,500,000 and 4,000,000 board feet of lumber. On March 2, 1971, petitioner, doing business as W.O.W., granted Paul A. Barber (Barber) and Marvin B. Noble (Noble) an option until June 1, 1971, to purchase W.O.W.'s land, timber, and sawmill for $750,000. Barber and Noble later had the timberland cruised in order to determine the amount of merchantable timber on the property. The cruise showed that there were 4,100,000 board feet of merchantable fir and 3,200,000 board feet of alder on the 7,700 acres of timberland. As a result of the cruise, the option price stated in the original agreement was reduced by supplemental agreement from $750,000 to $650,000. *326 By letter dated June 22, 1971, Publishers Paper Company (hereinafter Publishers) agreed to join with Barber and Noble in exercising the option. The option was exercised on or about June 30, 1971. Publishers paid $649,000 of the option price and received the 7,700 acres of timberland. Barber and Noble paid the other $1,000 of the option price and received the sawmill, the related machinery and equipment, and 23 to 50 acres of land on which the sawmill was located. On their income tax return for 1971, petitioners reported the sale of the sawmill, machinery, and equipment as a sale of property used in their trade or business under section 1231 and claimed an ordinary loss of $54,213.12 on the sale. They reported the sale of the 7,700 acres of timberland as the sale of a capital asset and claimed capital gain treatment on the installment of $144,172 received in 1971. In the notice of deficiency, respondent made the following determinations: On or about June 30, 1971, you sold land and timber for $649,000.00 on the installment basis. Profits of $144,172.80 from the 1971 collections were reported as long-term capital gains on the premise that the sale was a disposition of *327 land and timber held for investment purposes. During 1971 you also reported an ordinary loss of $65,349.39 from the disposition of business assets. [Included in this loss claim were net losses of $11,136.27, not involved in the instant case.] It is determined that the land and timber were business assets held for use in your sawmill operations. Therefore, the gain of $144,172.80 is subject to the provisions of section 1231(a) of the Internal Revenue Code relating to the disposition of property used in the trade or business. The gain of $144,172.80 must be combined with other gains and losses realized from the disposition of assets used in the trade or business to compute the capital gains for 1971. This results in a net capital gain of $39,411.70 from the disposition of assets used in the trade or business computed as follows: Gain on sale of land and
timber
$144,172.80
Loss on sale of other
assets
(65,349.39)
Net long-term capital gain
$ 78,823.41
Section 1202 deduction
39,411.71
Capital gain includable in
income
$ 39,411.70
Based on the foregoing the ordinary loss deduction of $65,349.39 from the disposition of assets *328 used in the business is eliminated and long-term capital gains are reduced $32,674.70 computed as follows: Capital gains, above
$39,411.70
Capital gains reported
72,086.40
Reduction in capital gains
$32,674.70
OPINION The issue to be decided is factual. Section 1231(a)[2]/ provides for the netting of gains and losses from the sale of property used in a taxpayer's trade or business. Respondent's determination in the notice of deficiency is based on the theory that the 7,700-acre tract of timberland, as well as the sawmill and related property, was property used in petitioners' sawmill and lumber business and, therefore, the ordinary loss from the sale of the sawmill should be subtracted from capital gain from the sale of the land. If respondent is correct, petitioners' claimed ordinary loss deduction will be extinguished and petitioners' reported capital gain reduced by the amount of the loss. *329 Petitioners maintain that the 7,700-acre tract of timberland was not property used in their sawmill and lumber business but was property held for investment, a capital asset within the meaning of section 1221. If petitioners are correct, their ordinary loss on the sale of the sawmill is fully deductible, and the full amount of their gain on the sale of the timberland is taxable as long-term capital gain. Thus, the issue is whether the 7,700-acre tract of timberland was real property used in petitioners' lumber and sawmill business within the meaning of section 1231, as contended by respondent, or property held for investment and as such a capital asset within the meaning of section 1221, as argued by petitioners. Section 1231(b)[3]/ defines "property used in the trade or business" to include "real property used in the trade or business, held for more than 6 months." Section 1221 [4] defines "capital asset" to mean "property held by the taxpayer (whether or not connected with his trade or business)," the most obvious example being property held as an investment. Both sections expressly exclude inventory property as well as property held by the taxpayer primarily for *330 sale to customers in the ordinary course of his trade or business. These definitions and their common exclusions have led to the development of criteria for placing property in its appropriate category for calculating the tax consequences of given transactions. Applying these criteria in determining whether an asset is used in a trade or business, constitutes an investment, or is held for sale in the ordinary course of business requires consideration of all the facts of the case. See Luhring Motor Co. v. Commissioner,42 T.C. 732, 751 (1964); R. E. Moorhead & Son, Inc. v. Commissioner,40 T.C. 704, 709 (1963); Eline Realty Co. v. Commissioner,35 T.C. 1, 5 (1960). *331 In order to be considered property used in a trade or business, an asset must be devoted to a taxpayer's business or acquired with a view to its future business use. Alamo Broadcasting Co. v. Commissioner,15 T.C. 534, 541 (1950); Carter-Colton Cigar Co. v. Commissioner,9 T.C. 219, 221 (1947).In Eline Realty Co. v. Commissioner,supra at 5, this Court held that two criteria to be considered in determining whether an asset was held for sale in the taxpayer's business or was instead held as an investment are the intent of the taxpayer in acquiring, and his purpose in holding, the asset. See also Alamo Broadcasting Co. v. Commissioner,supra at 541. In Latimer-Looney Chevrolet, Inc. v. Commissioner,19 T.C. 120, 125 (1952), we likewise held that the taxpayer's purpose and intent in acquiring and holding an asset were important considerations in determining whether the asset was used in a trade or business or was, instead, held primarily for sale in the ordinary course of business.Thus, for the purpose of determining whether an asset is used in a trade or business or is held as an investment, *332 the intent of the taxpayer in acquiring the property and the reason for holding it are factors to be taken into account.
On liquidation of the corporation, petitioner received the 7,700-acre tract of cut-over land and held it with a view to its eventual resale. Such an acquisition ordinarily would be classified as a capital asset without question. During 1961 through 1971, however, petitioner was engaged in the operation of a sawmill-lumber business, and respondent argues that the cutting of scattered trees from petitioner's 7,700-acre tract of land for processing through the sawmill causes the entire tract to be treated as real property used in the sawmill business within the meaning of section 1231. We do not agree. Simply because an asset is actually used to some extent in a trade or business does not automatically cause the asset to be considered a section 1231(b) trade or business asset. R. E. Moorhead & Son, Inc. v. Commissioner,supra at 710. Indeed, it seems clear that one may be engaged in a trade or business and hold assets which ordinarily would be usable in that business but still may hold such assets as an investment or, if the facts so show, *333 as property held for sale to customers. R. E. Moorhead & Son, Inc. v. Commissioner,supra;Greene-Haldeman v. Commissioner,31 T.C. 1286(1959), affd. 282 F.2d 884 (9th Cir. 1960). In order to determine whether an asset is used in a trade or business or is instead an investment, the taxpayer's intent in acquiring the property, his reason for holding the property, the relationship of the property to the taxpayer's trade or business, and the extent of its use must be examined and weighed in the light of all the facts and circumstances. It is true that, during the period 1961 through 1971, 13,909,080 board feet of timber were cut from petitioner's timberlands, and about one-fourth of the tract was used in the logging operations. Respondent makes much of the enormity of this board-feet figure. Although the figure seems large to one uninitiated in the timber industry, an informed witness testified that 40 acres of good second-growth timber will produce 3,500,000 to 4,000,000 board feet. Thus, the timber cuttings from petitioner's land for 11 years, 1961 through 1971, could have been harvested from about 160 acres of good second-growth *334 timber. Over 80 percent of the timber processed through the W.O.W. sawmill came from logs purchased at the mill and logs taken from purchased standing timber. Petitioner's timberland had already been logged and only scattered merchantable timber, located in deep canyons and other places missed when the property was logged, remained on it.W.O.W. did not undertake a systematic cutting of the remaining trees but merely allowed gyppo loggers to cut them and deliver them to the mill for processing. The incidental use of this 7,700-acre tract in connection with such cutting of scattered timber did not convert the tract from investment property to real property used in the sawmill business within the meaning of section 1231. We think petitioners' position that W.O.W. held this timber property for investment--the profit that would eventually be realized from its sale--is the only reasonable ultimate fact to be drawn from the evidence. When the corporation was liquidated, petitioner accepted the cut-over timberlands and allowed his brother-in-law to receive the lands on which merchantable timber was growing only because he hoped to eventually sell the land for a good price. He thought *335 there was only one way the price "could go, and that was up." The tract was located near the holdings of some large corporations, such as Georgia-Pacific Corporation, which were looking for land for reforestation.The sawmill was obsolete; most of the crew that had operated it was gone; and petitioner did not operate the mill initially but was induced to return it to operation by Harry Lagestee, a hardworking manager who was willing "to haywire the thing for awhile." We think petitioner held the 7,700-acre tract of land for investment purposes. Respondent seeks support for his position in the fact that petitioners employed the capital gains provisions in reporting W.O.W.'s income from its timber cutting, but this does not aid respondent's cause.Section 1231(b)(2) defines real property used in the trade or business to include "timber * * * with respect to which section 631 applies." Under section 631(a), a taxpayer who owns, or has a contract right to cut timber, may elect to treat the cutting and sale of timber as a sale or exchange. Petitioner made this election and claimed depletion accordingly with respect to the timber cut from portions of the 7,700-acre tract. However, contrary *336 to respondent's position, such election provides no ground for concluding that the tract of land was used in the sawmill business. Prior to the enactment of the predecessors of sections 631 and 1231(b)(2), a timber owner who cut and marketed his timber was taxed on the proceeds as ordinary income whereas the proceeds of the sale of standing timber were taxed as capital gain. This inequity and the need for wood and paper products during World War II led to the legislation embodying these sections. As stated by the court in United States v. Brown Wood Preserving Co.,275 F.2d 525, 528 (6th Cir. 1960): Its [the legislation's] purpose is obvious. It was intended to promote a continuing timber industry by giving a tax benefit to the timber operator in the year in which he realized the fruits of many years of labor, no matter in what manner he sold his trees. It was, in the truest sense, intended to relieve against an excessive tax burden. * * *
* * * the word "timber" appears to have been intended to carry the meaning which the general public attaches to it--a tree or stand of trees. * * * [Fn. ref. omitted.] See also sec. 1.631-1(a), Income Tax Regs. *337 ; S. Rep. No. 627, 78th Cong., 1st Sess. (1944), 1944 C.B. 973, 993. The incidental use of portions of the 7,700-acre tract in connection with the gyppo logging, for the reasons stated above, is not sufficient to show the tract was held for use in petitioner's trade or business. Respondent's brief hints that petitioners' claimed loss of $54,213.12 on the sale of the sawmill and related property was excessive on the theory that the allocation of $1,000 of the sales price to those items and $649,000 to the land was unrealistic. Petitioners strenuously object to requested findings to that effect on the ground that neither the notice of deficiency nor the pleadings raise such an issue.The allocation of the purchase price was made by Publishers, Barber, and Noble. The record does not establish that Publishers allowed Barber and Noble to purchase the sawmill property for $1,000 as a means of compensating them for the option rights they transferred to Publishers. And a trial of the instant case on such theory would have presented a wholly different set of issues, including an allocation of the basis in 1961, when the corporation was liquidated, between the 7,700-acre tract *338 and the sawmill and related property, the relative values of the two properties in 1971 when they were sold, the negotiations and agreements between Publishers and Barber and Noble, and other matters. Since this contention was not raised until the briefs were filed, it will not be considered as a basis for our decision. We conclude that the 7,700-acre tract was a capital asset within the meaning of section 1221 and was not property used in petitioners' trade or business within the meaning of section 1231. Cf. Eline Realty Co. v. Commissioner,supra;R. E. Moorhead & Son, Inc. v. Commissioner,supra.
To reflect the foregoing and a conceded adjustment, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule.--If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *↩
3. /Sec. 1231(b) provides in part as follows: (b) Definition of Property Used in the Trade or Business.--For purposes of this section-- (1) General rule.--The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not-- (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *
(2) Timber, coal, or domestic iron ore.--Such term includes timber, coal, and iron ore with respect to which section 631 applies. * * *↩
4. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *↩