**Louis E. DURR, Jr. and Mrs. Claire Durr, Plaintiffs,**

v.

**Chester A. USRY, District Director of Internal Revenue, Defendant.**

**Civ. A. No. 6052.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 18, 1958.

Polack & Rosenberg, Samuel I. Rosenberg, New Orleans, La., for plaintiffs.

M. Hepburn Many, Prim B. Smith, Jr., New Orleans, La., Leo McCormack, Herbert Awe, Washington, D. C., for defendant.

J. SKELLY WRIGHT, District Judge.

This case presents the question whether the profits realized by the plaintiff on certain sales of real estate in 1952 and 1953 are entitled to capital gains treatment. The plaintiff-taxpayer [1] reported them as such, but the Commissioner assessed a deficiency, stating that the properties sold were "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" under Section 117 of the Internal Revenue Code of 1939,[2] and that the profits from these sales were, therefore, taxable as ordinary income. The taxpayer paid the deficiency assessment under protest and now sues for a refund, asserting that the properties were acquired "for investment purposes" and were not sold in the ordinary course of his business.

In determining the tax status of real estate transactions of this kind, each case must be decided on its own facts,[3] and so there are no "landmark" decisions in this area. However, the

---

1. The taxpayer and his wife filed joint returns in 1952 and 1953, and both appear as plaintiffs in this suit for refund. Since only Mr. Durr's activities are involved, this opinion will, for convenience, refer to him alone as taxpayer and plaintiff.

2. Section 117 of the Internal Revenue Code of 1939 (as amended by Section 210 (a) of the Revenue Act of 1950, c. 994, 64 Stat. 906), 26 U.S.C. § 117, 1952 ed., reads:
   "§ 117. Capital gains and losses
   "(a) Definitions. As used in this chapter—

   "(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of this trade or business; * * *."

3. Smith v. Dunn, 5 Cir., 224 F.2d 353.

Court of Appeals for this Circuit has elaborated, in numerous decisions,[4] certain "ground rules" to be observed by the trial court in surveying the facts. Each of the following elements of the individual case must be considered and weighed:

1. The vocation of the taxpayer at the time of the sales or prior thereto, and its relation to the transactions in question;

2. the number, frequency and continuity of sales;

3. the time for which the property was held;

4. the extent, nature and timing of taxpayer's efforts to promote sales;

5. the extent and continuity of taxpayer's sales activities as compared with his other remunerative undertakings;

6. the substantiality of sales income as compared with taxpayer's income from other sources.

These are the principal points of reference which, taken in the context of the "total fact situation,"[5] will distinguish a speculative investment[6] from a commercial enterprise,[7] a bona fide liquidation of a capital asset[8] from a sale in the ordinary course of business.[9] The stated purposes for which the property was acquired, held, and sold must be considered in the light of, and may be qualified by, the objective facts listed above.

The taxpayer in the present case described himself on his income tax returns as a "real estate man," and at trial he testified that he and his father had for some years carried on "quite a neighborhood business in selling property to people and for people." Taxpayer is licensed to sell real estate. He and his father are well known as real estate dealers in the neighborhood where they share an office. Their office has a sign outside which reads: "L. E. Durr Real Estate." Taxpayer's business includes managing rental properties for his own account and for others, placing mortgages for his own account and for others, arranging insurance on real estate, and selling real estate on commission. He insisted that his activities in buying and selling real estate for his own account were not part of his "business."[10] These activities were as follows:

In 1945 taxpayer owned a number of improved properties which, while he held them, provided rental income. He sold one of these in 1946 and one in 1947. In 1949, he made 2 purchases of improved property. In 1950, he made 2 purchases of improved property, 2 of unimproved lots, and 2 sales of improved property. In 1951, he made 4 purchases of improved property, 15 of lots, 6 sales of improved

---

4. Thomas v. Commissioner of Internal Revenue, 5 Cir., 254 F.2d 233; Gamble v. Commissioner of Internal Revenue, 5 Cir., 242 F.2d 586; Goldberg v. Commissioner of Internal Revenue, 5 Cir., 223 F.2d 709; Lobello v. Dunlap, 5 Cir., 210 F.2d 465; King v. Commissioner of Internal Revenue, 5 Cir., 189 F.2d 122; Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; Greene v. Commissioner of Internal Revenue, 5 Cir., 141 F.2d 645; Snell v. Commissioner of Internal Revenue, 5 Cir., 97 F.2d 891.

5. Thomas v. Commissioner of Internal Revenue, supra [254 F.2d 236].

6. Thomas v. Commissioner of Internal Revenue, supra.

7. Gamble v. Commissioner of Internal Revenue, supra; Greene v. Commissioner of Internal Revenue, supra.

8. Ross v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 265; Smith v. Dunn, supra; Goldberg v. Commissioner of Internal Revenue, supra.

9. Galena Oaks Corporation v. Scofield, 5 Cir., 218 F.2d 217.

10. However, some of taxpayer's sales for his own account appear to have been directly related to his commission business. One of taxpayer's clients testified that he had purchased a house from the Durrs prior to 1953, a commission sale; that when, in 1953, he decided to move, he went back to the Durr office and was sold one of taxpayer's unimproved lots (one of the sales involved in the present case); that he never occupied this lot but, instead, the Durrs sold him a third property on commission.

property and one sale of lots. In 1952, he made 15 purchases of lots, 2 sales of improved property and 12 sales of lots. In 1953, he made 3 purchases of improved property, 28 purchases of lots, and 10 sales of lots. This case concerns only the sales made in 1952 and 1953: 2 sales of improved property and 22 sales of lots.

Nine of the 24 properties sold in 1952 and 1953 were held by taxpayer for 10 months or less; the average period was 15 months. Of the 13 properties sold from 1946 to 1951, 10 were held 12 months or less. All of the lots purchased in 1950 and 1951, and half the lots purchased in 1952, were sold by the end of 1953. The sales were not made all at once, or in blocks, but were individual transactions with individual purchasers, spread over the two years in question. At least one sale or purchase occurred in each month during this period.

From September 1952 to February 1953, taxpayer regularly placed in the Sunday edition of the Times-Picayune small advertisements of lots for sale. Taxpayer is contending that none of his properties was purchased for immediate sale, and yet one lot, purchased in May 1952, was advertised for sale on September 28, 1952 and was sold in December, 1952. Another lot was purchased in July 1952, advertised on September 7, 1952, only three months later, and was sold in January 1953. The amounts expended on this advertising were small, but several persons who purchased lots from the taxpayer at this time testified that they came to the Durr office as a result of seeing the advertisements. In other cases the purchaser's attention had been attracted by a "For Sale" sign on the property itself. In one case, it was the knowledge that the Durrs were in the real estate business that brought a prospective purchaser to their office to ask if they had any lots for sale. Mr. Durr, Sr., said that they did, and directed the buyer to one of taxpayer's lots.

There was little in the testimony at trial to indicate how much time was spent by the taxpayer in arranging these purchases and sales. It was not his practice to take prospective buyers to see the lots. Interviews, negotiations, and the signing of papers in connection with the sales were carried on in regular office hours. It may be that taxpayer's sales activities were not extensive, but they were regular and continuous.

The evidence as to the substantiality of the gains realized on these sales, as compared with taxpayer's income from other sources, was presented in such a way as to cast a shadow on taxpayer's case. Taxpayer offered a sheet of statistics, prepared by his accountant, which purported to show the amounts of taxpayer's income from various sources, and the percentage of net income from each source. The figures given for 1952 and 1953 do not agree with the figures found in the federal tax returns for those years. The income connected with sales of property has, in the accountant's report, been apportioned between "Recognized Gain on Sales" and "Interest on Vendor's Lien Notes." This latter item, which would be taxable as ordinary income, does not appear in the tax returns, and all income on account of sales is reported therein as long-term capital gain. In the report, the interest on vendor's lien notes was excluded from the calculation of the percentage of net income attributed to sales of property, and the result was a much smaller figure than that based on the tax returns. At trial, the accountant's percentages were offered in evidence with no indication or explanation of these discrepancies. Apart from the fact that it appears to reveal a serious error, not in issue in the present case, in taxpayer's method of attributing his income, the accountant's report casts a shadow of doubt on the rest of taxpayer's testimony. The unexplained percentages may be disregarded, but the doubt remains.

The following analysis of taxpayer's income in 1952 and 1953 is taken from his income tax returns:

|  | | 1952 | | 1953 |
|---|---|---|---|---|
| Net Rental Income | | $4,895.44 | | $4,768.76 |
| Commissions | | 3,305.02 | | 4,468.64 |
| Sales | 1,514.38 | | 1,012.50 | |
| Rent Collections | 611.03 | | 730.49 | |
| Insurance | 779.61 | | 2,125.65 | |
| Financing Loans | 400.00 | | 600.00 | |
| | 3,305.02 | | 4,468.64 | |
| Interest on Mortgage Notes | | 574.90 | | 3,352.03 |
| Interest on Homestead Accounts | | 329.00 | | 204.00 |
| (Expropriation Sale in 1953 | | | | 5,946.84) |
| Income Realized from | | | | |
| Installment Sales | | 5,758.98 | | 9,602.76 |
| Sales before 1952 | 2,432.78 | | 2,669.46 | |
| Sales in 1952 and 1953 | 3,326.20 | | 6,933.30 | |

These figures reflect the relative financial importance of the transactions in question, and they suggest, indirectly, the proportionate amount of "busyness"[11] involved. The figures given for income from installment sales represent only the amounts actually received by taxpayer in 1952 and 1953, not the full purchase price of the properties sold. These were credit sales, in which the purchaser made a small down payment and covered the rest of the price with vendor's lien notes maturing over a period of years. Taxpayer reports the sales and the installments on the cash basis, and, therefore, these figures may not fully reflect the benefit actually received by the taxpayer at the time of sale. Nevertheless, even on this accounting it is obvious that taxpayer realized in both years a very substantial portion of his income from the transactions now in question. In 1952, the sum was greater than his income from all his commissioned activities, and in 1953 it was greater than his income from any other source.

Taxpayer testified that he bought these properties "for investment purposes." At one point he attempted to explain this by saying that he had experienced a change in his "investment philosophy and theory" in 1951; that he purchased these properties in order to increase his holdings of mortgage paper or vendor's lien notes. He did not seem to realize that this amounted to an admission that the property was bought primarily for resale on credit. Taxpayer's clearest statement of his purpose in buying and selling for his own account was that he simply wished to make a profit. The opportunity to do so appears to have arisen directly out of his experience in a diversified real estate business. He was prepared to hold these properties or to sell them on credit whenever the price was right. The phrase "investment purposes" sounds very much like an afterthought. As a statement of fact, it is in conflict with all the reasonable inferences to be drawn from taxpayer's actual conduct with regard to these properties.

Taking all the facts together, it is clear that taxpayer's trading in real estate for his own account in 1952 and 1953 amounted to "an occupational un-

11. See Snell v. Commissioner of Internal Revenue, supra, 97 F.2d at page 892.

dertaking which required the habitual devotion of time, attention or effort with substantial regularity." Thomas v. Commissioner of Internal Revenue, supra. The properties in suit, therefore, were bought and held primarily for sale in the ordinary course of taxpayer's business. The income from such sales is taxable as ordinary income.

Judgment for defendant.