**GATE CITY STEEL, INC.,—OMAHA, Plaintiff,**

v.

**James L. McCRORY, Former District Director of Internal Revenue, Defendant. Civ. No. 01098.**

United States District Court
D. Nebraska.
May 21, 1964.

ROBINSON, Chief Judge.

Plaintiff brings this suit to recover the principal amount of income taxes allegedly illegally and erroneously assessed against and collected from plaintiff by defendant for the taxable year ending January 31, 1953, together with assessed and paid interest thereon plus statutory interest.

This Court has jurisdiction of the matter by virtue of Title 28, United States Code, § 1340.

Taxpayer appears to have complied with 26 U.S.C. § 7422[a] and 6532[a] and with 26 CFR 301.6402–2.

Gate City Development Company [Development]. was organized in October, 1950, and was a wholly owned subsidiary of Gate City Steel, Inc. up through the taxable year in question in this suit.

Plaintiff filed a timely [within extension periods granted by the District Director] consolidated return for itself and its subsidiaries for the taxable or fiscal year ended January 31, 1953.

In this return it reported long term capital gains for Development for "Leduc, Canada oil property and equipment" in the amount of $41,245.32 and for "Lloydminster, Canada oil property and equipment" in the amount of $1,105,-230.37. The return reported a tax liability in the amount of $324,896.64 [Stip. Ex. 48] which was paid to the defendant in four installments, the last installment having been paid in January, 1954.

As a result of an examination of plaintiff's income tax return for the year in question, the Commissioner of Internal Revenue issued a statutory notice of deficiency on May 25, 1959 in which he determined a deficiency in income tax for the taxable year ended January 31, 1953, in the amount of $275,259.93. Such de-

ficiency was assessed against plaintiff, and on or about September 21, 1959, plaintiff paid the defendant at Omaha, Nebraska, additional income taxes of $275,259.93, together with interest assessed thereon in the amount of $105,820.47, or a total of $381,080.40.

In making the aforesaid determination of deficiency, the Commissioner stated:

"It is determined that the Lloydmunster and LeDuc properties were held for sale in the ordinary course of your trade or business. Therefore the profit from the sale of such properties in the amount of $1,122,535.38 is taxable as ordinary income in accordance with Section 22 of the Internal Revenue Code of 1939 in lieu of net long-term capital gains [Section 117(j) of the Internal Revenue Code of 1939] as reflected in your income tax return for the taxable year ended January 31, 1953."

Plaintiff filed a claim for refund on December 30, 1959. By letter of March 1, 1960, defendant denied the claim for refund. Defendant has not refunded any part of the claimed sum to plaintiff. This suit was filed on October 28, 1960.

Plaintiff was at all material times in the steel warehousing and fabricating business. [Stip., par. 1]. Development's Certificate of Incorporation gave it broad powers to carry on an oil and gas business. [Stip., Ex. 1]. In the year 1954 Development filed with the Secretary of State of Delaware an amendment of its Certificate of Incorporation to change its name to Gate City Steel, Inc.-Denver, and to change its objects and pur-

poses to those of its parent, Gate City Steel Works, Inc. [Stip. Ex. 2].

Husky Oil Company [Husky] and its subsidiary, Husky Hi-Power, Inc. constituted an integrated oil and gas enterprise engaged in exploration for and production of crude oil and natural gas, refining of crude oil and wholesale and retail marketing of refined petroleum products. Generally, its operations have been carried on within the United States. Some activity was carried on in Canada. [Stip., par. 4].

Husky Oil and Refining Ltd. [Husky Refining] was organized under the laws of the Province of Saskatchewan in 1947. Husky Refining carried on a business of acquiring, exploring, developing, operating and producing oil and gas properties. It also operated a refinery at Lloydminster, Saskatchewan. All of its operations were carried on within Canada. [Stip., par. 5].

At all times during the period from October 2, 1950 [the date of Development's incorporation] to January 31, 1954, Glenn E. Nielson, his wife, Olive W. Nielson, their children and trusts for the benefit of their children owned 8,532 shares of the common stock of plaintiff. During this period of time plaintiff never had outstanding more than 10,043 shares of its common stock. [Stip., par. 6].

On the dates indicated below Husky had outstanding and Glenn E. Nielson, his wife, Olive W. Nielson, their children and trusts for the benefit of their children owned the number of shares of common stock set opposite that particular date. [Stip., par. 7].

| DATE | SHARES OUTSTANDING | OWNED BY NIELSONS | PERCENTAGE OWNED BY NIELSONS |
| --- | --- | --- | --- |
| 9/15/52 | 2,301,523 | 1,608,835 | 69.9 |
| 9/21/53 | 2,337,903 | 1,618,749 | 69.2 |
| 12/19/53 | 2,337,903 | 1,625,654 | 69.5 |
| 2/15/54 | 2,337,903 | 1,621,967 | 69.4 |

On the dates indicated below Husky Refining had outstanding and Husky owned the number of common shares set opposite that particular date. [Stip., par. 8].

| DATE | SHARES OUTSTANDING | OWNED BY HUSKY | PERCENTAGE OWNED BY HUSKY |
|------|---------|---------|---------|
| 12/31/50 | 1,090,846 | 950,486 | 87.1 |
| 12/31/51 | 1,461,175 | 1,007,226 | 68.9 |
| 12/31/52 | 1,957,857 | 1,164,320 | 59.4 |
| 12/1/53 | 1,957,857 | 1,168,950 | 59.7 |

Glenn E. Nielson of Cody, Wyoming, has been connected with Husky and its predecessors from the beginning, it having been organized at his instigation. [Tr. 2]. He has always been a director and President of Husky and its predecessor. [Tr. 2 and 3]. In Husky they sought to build an oil company attempting to bring production, refining and marketing in equal volumes to be in equal balance. They invested refining income in drilling deals. He was aware that Husky could "expense" the intangible costs of drilling those wells and that intangible drilling costs could be written off against refining profits. [Tr. 3].

Nielson has at all times been connected with Husky Refining from the time of its organization, having been a director thereof at all times, and having held the office of President. During the years 1952, 1953 and 1954 Husky Refining carried on a business of acquiring, exploring, developing, operating and producing oil and gas properties. [Tr. 4]. Until a "spin-off" in December of 1953, Husky at all times owned more than a majority of the number of shares of Husky Refining. In 1948 Nielson acquired all of the outstanding common stock of Gate City Steel. He and his family controlled Gate City Steel at all times until, say, January 31, 1954. [Tr. 5]. At all times during the years 1952, 1953, and 1954, he and his family controlled Husky Oil Company. [Tr. 4]. Nielson was a director of Gate City Steel and acted as chairman of the meetings. He was at all times during the years 1951, 1952, 1953 and 1954 a director of Development. He was chairman of Development. [Tr. 5].

When Nielson acquired Gate City Steel, which had formerly been called Gate City Iron Works, he had a business plan in mind for that company. In the case of Husky and Husky Refining it had been their objective to acquire reserves and production and markets. When they purchased Gate City Steel, he and his associates found that they had a substantial income. It was their thought that they could expand the earnings of Gate City Steel and by so doing build an oil company. The amount of earnings that Gate City Steel had was substantially above what they had in their early days in Husky. Therefore, they were quite optimistic about the possibilities of "expensing the profits, expensing the intangibles and building an oil company." [Tr. 6]. When Development was incorporated in 1950, it was planned to use the personnel of Husky in finding "plays" and programs and in managing and handling the operations of Development. In October, 1950, the stock ownership of Gate City Steel and Husky was about the same. [Tr. 7] It was thought that Development could avail itself of the experienced personnel of Husky. To see that it was equitably done, a calculation of costs was made and a monthly fee of $4500.00 was charged to Development for services of Husky personnel. For that $4500.00, any needed personnel were made available to Development but particularly geological and

engineering supervision. [Tr. 8]. After the success they had had with Husky with a very limited income, Nielson and his staff were quite optimistic about building production in Development; it looked like a good program to add assets to this company. [Tr. 10 and 11].

## LLOYDMINSTER

Husky Refining and Development entered into a letter agreement of August 18, 1951 as follows:

Husky Refining will submit to Development well sites in the Lloydminster and Eatonia Fields in Canada and Development will have the right of purchase within ten days. In event of purchase of a well site by Development, the conveyance of oil property by Husky Refining would be as follows: Development will have the obligation to provide and pay for the drilling of a well. Husky Refining will furnish all equipment and other capital items required in the well and on the land for drilling, production and storage of oil, retaining title to such equipment and items until fully reimbursed therefor by Development's paying to it twenty percent [20%] of the gross proceeds from the sale of all oil produced from the well until the aggregate of all payments thereunder and under all other similar conveyances from Husky Refining to Development, if any, equal the aggregate of all costs to Husky Refining of all such equipment and items. Development agrees to sell and Husky Refining agrees to buy all oil produced and saved from the well.

Simultaneously with the execution and delivery of the conveyance Development would enter into an operating agreement with Husky Refining as follows: In consideration of payments made by Development, Husky Refining agrees to drill a well upon the oil property, and if it is a producing well, to supervise the installation of the necessary casing, tubing, rods, pumping equipment, lines and tanks necessary to produce and store the oil and thereafter to manage, produce and operate the well, and in the event of a dry hole or poorly producing well, to plug and abandon same. Development agrees to pay Husky Refining, for drilling the well, including the furnishing of labor, supplies and equipment, but excluding equipment and capital items to be furnished by Husky Refining at its cost pursuant to the conveyance at a stated sum payable on completion of the well, and for services to be performed by Husky Refining in managing, producing and operating said well, at a per barrel rate, the same to be payable monthly from the proceeds of the sale of such gross production, and for plugging and abandoning a well, in the sum of $1000.00, payable on completion of such abandonment.

Upon execution and delivery of the initial conveyance and operating agreement, Development would either:

a) enter into an option agreement with Husky Refining, providing that Development grants to Husky Refining an option to purchase Development's interest in all of said lands which are developed by Development for production of oil and gas, and providing that the purchase price payable by Husky Refining from the exercise of the option shall be 125% of the direct cost of said lands to Development. Any proceeds received by Development from the sale of oil and gas produced from said lands shall reduce said purchase price pro tanto. "Direct cost" shall mean [a] all of the payments made by Development to Husky Refining under the Operating Agreements relating to said lands; and [b] all additional moneys, if any, expended by Development in the acquisition, drilling, development, production, operation, and maintenance of said lands. There is a provision for terms of payment, which provides for a minimum monthly payment based on production. Husky Refining agrees that it will operate all of said lands in a good and workmanlike manner and will produce and sell the maximum amount of oil therefrom consistent with good practice and government rules. Husky Refining shall be liable

for no deficiency in the event the payments provided for in the option agreement shall be insufficient to pay Development the full purchase price, the purchase price being a contingent deferred purchase price only. The option granted to Husky Refining may be exercised at any time during a calendar month named by Development, of which notice shall be given to Husky Refining by Development at least 30 days prior to the commencement thereof, and, further, in any event, the calendar month so elected shall not be later than the month of November, 1952. In the event Husky Refining exercises its option, Development shall promptly transfer and assign to Husky Refining its entire right, title and interest in said lands and all wells and equipment situated thereon, or

b) Upon execution and delivery of the initial conveyance and operating agreement, Development will cause a corporation to be formed under Canadian law, with itself the sole stockholder. Development would enter into an agreement with Husky Refining substantially as follows:

Development grants to Husky Refining an option to purchase all the stock of this corporation, and agrees that this corporation will not dispose of any oil or gas rights in Lloydminster or Eatonia Fields. The purchase price payable by Husky Refining upon the exercise of the option shall be 125% of the direct cost of the shares to Development. Any payments to Development by this corporation by way of dividends or capital distributions would reduce the purchase price pro tanto. "Direct cost" is then defined. The remainder of the Stock Option Agreement is generally similar to the Option Agreement. Whenever a well shall be completed as a producing well or plugged in the event it is a nonproducer as provided in the Operating Agreement, then the well and the property upon which such well is located shall be conveyed to this corporation under a bargain and sale deed and subject to the terms and provisions of the conveyance and operating agreement. Said property as so conveyed shall constitute an additional capital contribution by Development.

The first group of prospective well sites will be submitted by Husky Refining to Development not later than August 15, 1951, and no prospective well sites will be submitted after December 31, 1951. Development's aggregate commitment under the Operating Agreement for drilling, plugging and abandoning the well shall not exceed $500,000.00 [later increased to $1,000,000.00]. All wells to be drilled under the operating agreement will be completed either as producing wells or plugged and abandoned in the event they are non-producing wells not later than January 31, 1952. [Stip., Ex. 12 and 14].

This letter agreement was amended on August 30, 1951 so as to pertain to natural gas, and again on October 19, 1951 to change the amount of money as indicated in the previous paragraph hereof. [Stip. Ex. 13 and 14].

In working out this trade between Development and Husky Refining on the Lloydminster properties they had, as a pattern to go by, the JSP deal. Nielson attempted in these deals involving companies that he controlled, to insure that they were fair and equitable, to pattern them as closely as possible after a deal that had been negotiated at arm's length.

In the JSP deal, Husky Refining, pursuant to letter agreement between itself and the JSP group, submitted well sites to the JSP group. [Tr. 13]. If the JSP group accepted the well site, Husky Refining and Empire Trust, as agent for that group, executed conveyances and assignments and operating agreements as to each such well site. The JSP group made assignments to Rock Creek Oil Company as to each well site. A stock option agreement was executed. [Tr. 14]. Husky Refining drilled the wells for a "turn-key" price, which means

that the driller must take all the hazard and risk of drilling the well, i. e., unless the drilling is completed, the driller receives no pay for the work done. [Tr. 14–15]. On completed wells Husky Refining was to receive an operating charge and was also to furnish tangibles, i. e., casing, etc., for which it would be reimbursed at 20% of the gross. The agreement required the JSP group to assign these properties to Rock Creek Oil and Husky Refining had an option to purchase the stock of Rock Creek. [Tr. 16]. Husky Refining, in accordance with not uncommon oil business practice, kept the right to purchase the oil and the right to repurchase the acreage. They retained the option to purchase the stock of this company to which the wells would be assigned. [Tr. 18]. In the JSP transaction the JSP group would pay all intangible drilling development costs to the casing point and Husky Refining would install all equipment, and this equipment would be paid for out of twenty percent of the proceeds. [Tr. 20]. It was intended that title to the equipment would be lodged in the JSP group when Husky Refining had been repaid out of the twenty percent of the proceeds of the sale production. [Tr. 21].

In the Lloydminster transaction between Development and Husky Refining, the turn-key price for drilling a well to the casing point was $20,000. [Tr. 22].

Nielson felt fully justified in the light of the JSP trade in making the Lloydminster trade between Development and Husky Refining. The Nielson family was in control of Development and Husky Refining. They needed more oil in Canada and it seemed to them that this would be a good way to bring together the interests of the two operations with benefit for both. [Tr. 23].

As to the JSP group, Husky Refining on August 1, 1951, exercised its option on stock of Rock Creek Refining as of September 1, 1951. The option purchase price was to be payable at the rate of Seventy-five Cents [$.75] per barrel of production. Husky Refining paid out the option price on a per barrel basis from September 1 until March 1952 and thereafter they paid for the program in common stock, which helped it to have some equity financing. [Stip., Ex. 31—Tr. 25, 26, and 51].

Husky Refining did not exercise its option to purchase the Lloydminster properties from Development. Husky Oil Company paid Development for the conveyance of these properties 11,050 shares of Husky first preferred stock, of par value of $100.00, which has a dividend rate of six percent, and is cumulative. [Tr. 28]. After Husky acquired these properties from Development, it sold them to Husky Refining for 125,953 shares of common stock of Husky Refining at a price of $10.79 per share. [Tr. 29]. This was apparently an advantageous deal for all three companies. Husky Refining made no written release of its option to purchase the properties sold to Husky. [Stip., par. 18].

## LeDUC

Gate City Development, Mountain States Drilling Company and Vivian Beaumont Allen entered into an "Assignment and Operating Agreement" dated August 23, 1951. This is described in Development's financial statement of January 31, 1952 as follows:

"On August 23, 1951 the company and one Vivian Beaumont Allen jointly acquired a farm-out arrangement in the LeDuc Area of Alberta from Mountain States Drilling Company. Mountain States retained a carried interest equal to one-half of the interest assigned, such interest to revert to Mountain States after recovery by Mrs. Allen and the company of their entire cost of drilling, equipping lease and operating the property. * * * "

Development is designated in the instrument as operator. [Stip., Ex. 41 and 54].

On August 17, 1951, the Board of Directors of Development had authorized the working out of a farm-out from Mountain States Drilling Company to

Development. [Tr. 11]. The minutes of Development's Board meeting dated August 17, 1951 show that Mr. Lee stated that the Company was negotiating with Jack E. Manning and Mountain States Drilling Company for acquisition and drilling by the Company of certain oil and gas lands in the South LeDuc Field in Alberta and that a deal with Manning and Mountain States Drilling Company was authorized. [Stip. Ex. 4]. There was no connection between Mountain States and Development. Mountain States was a drilling company headed by Jack Manning who had obtained this farm-out in the LeDuc Area from Imperial Oil. [Tr. 12]. In describing the circumstances under which the sale of the LeDuc property came about, Nielson stated that the wells started out with a very encouraging rate of production, that they later dropped to somewhere around 25 percent of their initial production, that it was an alarming decline and indicated that the wells were not as valuable as hoped or anticipated when first completed, that Mrs. Vivian Beaumont Allen was advised to dispose of them, that there were some negotiations for a period of time relative to disposing of those properties, that they agreed on a price at which Husky refining would be willing to buy the wells, that they felt it would be a good program to dispose of the wells as far as Development was concerned at the same time. [Tr. 33]. The purchase prices of these sales were paid in Husky Refining Capital stock, and a small cash amount. Mrs. Allen sold her Husky Refining common shares. Development sold its common shares in Husky Refining to Husky. Nielson further stated that Development sold out because it thought it ought to go along with what Mrs. Allen did. [Tr. 34]. Nielson thought it was true that Mrs Allen actually sold her interests before Gate City Development ever sold its interests. He said it was a question of two small wells that would be in the stripper class and hardly worth keeping a double set of records for the amount of oil there, and it looked like it was wise to dispose of it while there was a pattern for the deal in that they had negotiated at arm's length with Mrs. Allen and with her accountants and representatives, and therefore it was felt by the management that since they had a price at which they could transfer it without problem as to good faith, they could go ahead and sell it at that time. Nielson also said that when you get those stripper wells, it is hardly worth while to keep a half interest in one of those little wells, that it is more trouble than it is worth. [Tr. 60].

The purchase agreement under which Development sold the LeDuc property to Husky Refining is dated as of July 3, 1952. This agreement states that Husky Refining desires to assume the duties of "operator" of such properties, that Husky Refining has heretofore purchased Mrs. Allen's similar interest in such properties by using its capital stock at an agreed value of $10.65 per share, that Development had informally assured Husky Refining in the event Husky Refining was able to purchase with its own capital stock the interest of Mrs. Allen in said properties, Development would sell its interest to Husky Refining for Husky Refining's capital stock using the same per share valuation as might be agreed between Husky Refining and Mrs. Allen, that the purchase price is $68,932.34, paid in 6472 shares of Husky Refining and cash in the amount of $5.54, that title would pass as of June 1, 1952 and that Husky Refining would take over operations of the properties as of June 1, 1952. [Stip., Ex 42 and 43].

Development sold to Husky the common shares of Husky Refining which it received as consideration for the sale of the LeDuc property to Husky Refining. This agreement, dated as of July 8, 1952, recites that Husky Refining is a subsidiary of Husky Oil Company and Husky Oil Company had given Development assurances that Husky Oil Company would purchase such shares of capital stock for the price paid by Development. [Stip., Ex. 44].

### REMAINING PROPERTIES

The minutes dated May 6, 1953 show that at a special meeting of the board of Directors of Development Mr. Nielson raised a question as to the desirability of the Company continuing in the oil business; that Mr. Nielson pointed out the cash problems of such operations and the difficulty the parent company was having in financing by reason of this company's oil and gas activities; that it was resolved that Development continue its present oil and gas exploration and development commitments but it shall not engage in or accept any new projects; that it was resolved further that as soon as practicable this corporation make arrangements to dispose of its oil and gas properties. [Stip., Ex. 8].

The minutes dated August 12, 1953 show that at a special meeting of the Board of Directors of Development, Mr. Luther advised the board that the firm of Berger and Pishney of Fort Worth, Texas had valued the producing properties of Development at $386,204.00, that Messrs. Buchanan and Araas had evaluated the non-producing properties at $27,333.70. These minutes further show that the board authorized the proper officers of the corporation to sell aforesaid properties to Husky Oil Company for $413,537.70; that the board authorized a method of receiving payment of this amount; that M. M. Luther was requested to make every effort to dissolve Development as soon as possible, and was authorized to transfer certain transportation equipment, stock option in Edward S. Marmon Companies and certain other assets to Gate City Steel Works, Inc., as partial payments on advances from said Gate City Steel Works, Inc.; that the board authorized Mr. Luther, Secretary-Treasurer, to take all actions and execute such documents as may be necessary and proper to effectively cancel the registration and permits of Development to do business in Indiana, Arkansas, Oklahoma, Louisiana, Colorado, Wyoming, Texas, Alberta and Saskatchewan "as soon as the assets of this corporation have been disposed of in said jurisdictions." [Stip., Ex. 9].

The minutes dated September 7, 1954 show that at a special meeting of the Board of Directors of Development, the board considered changing the name and the objects and purposes of the corporation; that the chairman stated that the proposed amendment would change the name of the corporation to Gate City Steel, Inc.—Denver, that he pointed out that the parent company, Gate City Steel Works, Inc., intended to change its name to Gate City Steel, Inc.—Omaha.

The minutes dated February 14, 1953 of the annual meeting of stockholders of Development show that Mr. M. M. Luther presented the statement of operations of Deveopment from inception to December 31, 1952; that Mr. Luther gave a financial statement and then pointed out that the operations had not been too profitable, but that the past six months had shown considerable improvement; that it was moved, seconded and carried that Development proceed with its operations in the hope that they will be more successful in the future, and that James C. Gilbert be in full charge and control of the Company's operations subject to the instructions and orders of the Board of Directors. [Stip., Ex. 11].

By Agreement and Conveyance dated September 30, 1953 Development sold all of the oil and gas properties it owned to Husky. This instrument recites that Development now owns interests in oil and gas leases on undeveloped properties and producing properties and owns interests in casings and pumps and other fixtures etc. [Stip., Ex. 45].

Nielson stated that Development finally decided to sell out its properties, and that there were a number of things that entered into their decision to stop drilling. One reason was poor results. Another reason was a problem of conflict of interest pointed out by their attorneys in New York, viz.: By this time they had sold common stock in Husky Oil Company to the public. Originally, regarding anything that their group was interested in,

they kept exactly the same percentage interest. If they owned it 100%, Nielson "had some place in the 80% and the other participants had the balance." Nielson was careful to see that their interests were parallel so that they could never be criticized for putting a deal some place where Nielson had a little more interest. [Tr. 38]. With common stock in Husky Oil sold to the public, this factor wasn't true any more. While they were making charges back and forth for the use of Husky personnel, their New York attorneys advised that it was fine as long as Gate City continued to operate as they had historically done up to that point, but that if they should ever strike a bonanza or an outstanding field, that any minority stockholder in Husky Oil could sue and cause them to put the valuable property back into Husky Oil, with attendant unpleasant publicity, so they immediately took steps to separate their two interests, and got another man in charge of Development's oil operations, a Mr. Gilbert, instead of handling it with Husky personnel. Mr. Nielson thought that a third and the convincing reason was that you don't build an organization overnight, you don't get men whose judgment and abilities you can depend upon. Nielson stated that the three reasons together really were the deciding factors. A fourth good reason was that the bankers didn't like the dry holes. [Tr. 39]. The bankers thought they had a nice company in the steel company, and they would feel better about taking care of Development's requirements if they would see that it operated in steel.

Development sold the remainder of its property to Husky Oil at a purchase price arrived at by outside evaluation of the properties, since they had no pattern to go by. [Tr. 40].

## OTHER FACTS

On December 21, 1950, Development agreed to share with Husky generally one half of the expenses of a "Ten Well Program," in return for one half of Husky's rights under the program. [Ex. 3]. They sought participation in this program on the basis of a free well on each tract for a half interest, and they obtained participation from outside investors.

In 1950 they had a refinery that was operating in Canada. [Tr. 41]. They needed production, [Tr. 42] and hence capital. [Tr. 43]. Nielson stated that Husky Oil Refining in Canada did have at the time of the JSP agreement in 1950, intangible costs or drilling credits which it was not able to use against its income, but that you can carry those forward indefinitely and take advantage of them at any future period. [Tr. 44]. The expenses which were incurred by Development were deducted on the consolidated returns with Gate City Steel against Gate City Steel's ordinary income. These deductions for intangible drilling costs reduced both the excess profits tax and the ordinary income tax of Gate City Steel. They were fully deducted by the Gate City Steel group, including the parent and the sub. [Tr. 45] Canadian Husky Refining for all the years under consideration here, 1951, 1952, 1953, never paid any income tax in Canada on its production, because of the fact that it was able to deduct these intangible drilling costs. [Tr. 46 and 47]. Nielson stated that he was sure that the amount of the developmental costs which had been deducted by Development were again available for deduction in Canada. [Tr. 47]. Plaintiff's counsel stipulated that the drilling credits from JSP and Gate City Development deal were carried forward as a drilling credit for Husky Refining. [Tr. 47]. Nielson reiterated that the drilling credits that went to JSP group and Development are also available now. [Tr. 48]. Husky Refining exercised its option in the JSP deal. Husky Refining entered into the JSP deal by an agreement dated June 14, 1950. [Ex. 25]. The option in the JSP deal was exercised on August 1, 1951 [Ex. 31] and within about two and one-half weeks another deal with Development was entered into. [Tr. 51]. The agreement between Development and Husky Refining is dated August 18, 1951. [Ex. 12]. Husky Oil was always wanting to acquire any property of this nature which was available. [Tr. 62]. Nielson

stated that they wouldn't have sold the Development property to anybody else as long as he controlled all three organizations, because they needed that oil and wanted the profit of it, and that, to their group, there is very little difference whether profits were in one place or the other. [Tr. 63].

In the oil industry some companies hire contract operators and others, such as Husky, operate their own. Nielson thought that hiring contract drillers is more common. After the conflict of interest was pointed out by the attorneys it was thought that Development would follow a method of allowing others to operate. [Tr. 67].

Moral R. McArthur, president of Rimrock Tidelands Inc., and vice-president of Husky, was in 1951, 1952, 1953 and 1954 in charge of exploration and production for Husky. [Tr. 68, 69]; he was vice-president of Husky Refining part of those three years; he was vice-president of Development until either May or June, 1952, when he resigned. [Tr. 69–70]. He was in charge primarily of Development's oil operations. [Tr. 70].

The five-well deal was a plan to drill five wells on five separate blocks, all wildcats. Development was to participate in the five-well program on the same basis that Husky Oil participated. The five-well program was patterned after the ten-well program. They thought the 5 and 10 well program one of the logical ways to start and build an oil company, because they had seen over the years "plays" develop such as this, companies built upon such type of operation, and they saw other companies and people organizing and actually selling participation in this type of operation in finding oil. [Tr. 71]. While he was an officer, somebody in his organization evaluated the geologic possibilities of each "play" or deal that Development went into, and consulted with him. This was done by him and other Husky personnel for the $4500 a month fee.

His instructions as to Development were that there were certain moneys being generated in Gate City Iron Works, which management thought should be put to work in the oil business. They wanted to build an oil producing department and McArthur and associates were asked to find-proven, semi-proven and wild-cat acreage which would lend itself to build an oil company, if they were successful. [Tr. 72].

Programs such as the five and ten well programs were ways that a company with limited means could expose itself to various plays in an attempt to find oil. Their purpose was to have an interest in a producing well. They wanted oil reserves. [Tr. 79]. These programs were intended to give the company some production which would continue into the future.

James G. Gilbert, who succeeded McArthur as vice-president of Development in June 1952, stated that his responsibility was to continue McArthur's work of acquiring and developing oil production and reserves.

At the annual meeting of the stockholders of Development held on February 14, 1953, Mr. Gilbert stated that Development has made 18 deals since June of 1952, of which 13 are in Texas areas, 3 in Arkansas, 1 in Canada and 1 in Louisiana; that out of these 18 operations, 10 had been completed, 6 were drilling and 2 ready to spud; that out of the 18, 4 were producers and 6 were dry out of the 10 that have been completed. [Tr. 84, Ex. 11]. In negotiating farm-outs or trades after he came in, Mr. Gilbert made farm-outs or trades in transactions in which Husky was not interested. [Tr. 84].

Mr. William F. McWhinney, who was employed by Husky Refining at the time of the JSP transaction and the Development transaction as office manager and chief accountant, was asked, "It has been stipulated that after Husky Refining acquired the JSP properties and the properties that Gate City Development owned that Husky Refining became entitled to their unused drilling credits. Do you know whether that use of those unused drilling credits was approved by the Can-

adian tax authorities?" He answered, "it was, yes." [Tr. 90].

Mr. Alton J. Danner, a Field Internal Revenue Agent of the Omaha office of the Internal Revenue Service, computed, based on the income reported on the returns, that for the year ended January 31, 1951 Gate City Steel Works had a decrease in tax in the amount of $202,312.74 attributable to loss by Development; that for the year ended January 31, 1952 it had a decrease in tax in the amount of $336,006.12, attributable to loss by Development and that for the year ended January 31, 1953 it had an increase in tax in the amount of $126,847.45 attributable to income by Development, for a total three year decrease in tax of $411,471.41. Mr. Danner further computed, based on the adjusted income which is not in dispute here, that for the year ended January 31, 1951 Gate City Steel Works had a decrease in tax in the amount of $195,008.09 attributable to loss by Development; that for the year ending January 31, 1952, it had a decrease in tax in the amount of $343,089.65 attributable to loss by Development; and that for the year ended January 31, 1953, it had an increase in tax in the amount of $92,702.62 attributable to income of Development, for a total net decrease in tax for the three-year period of $445,395.12. [Ex. A and B].

In the minutes of the December 21, 1950 Board meeting of Development, the ten well program is described as follows: participation by Development on an equal basis with Husky in a contemplated "Ten Well Program" wherein third persons would bear approximately eighty percent of the cost of drilling a test well on each of ten blocks of lease-hold acreage and would receive forty percent of the working interest under such leases, and that Husky was to act as operator and would hold Development's interest in trust until Development demanded or received assignments. [Stip. Ex. 3].

Nielson described the SCC deal as follows:

"Well the SCC deal was also arranged through the officers of the Empire Trust, and it was made at a later date, May 8, 1952.

"It was a somewhat different deal than the other one. In this deal we charged nine dollars an acre for the sites on which they drilled. They paid us $26,000 to the casing point rather than $20,000. Then they also paid 40 cents per barrel instead of the ten cents in the JSP deal, and under this program they never acquired the ownership of the equipment. Of course again Husky retained the call on the oil, which is the right to purchase it at the posted field price. We did not have an option to repurchase this property but we felt that with the 40 cents a barrel and the higher price that they were paying, plus their refusal to give us an option, that it was sufficient reason to go along. We were still needing more oil, and we felt we could live under this deal and at least be assured of getting that much more oil, and so we made that deal. "I think we sold to a corporation set up for that purpose called then the Rican Corporation at nine dollars an acre, and I believe the actual participants paid ten dollars an acre for the property. [Tr. 35]."

Nielson said that Husky Refining bought these properties later on; that they later worked out a deal to purchase the properties, and they purchased them on a better basis than they did the others, although they paid the SCC group more than 100% of their investment, which was two million, six hundred thousand dollars. Nielson stated, "This was a cash purchase at this time. We were getting in a better position as Husky, so we purchased these for cash." This was a purchase on which they had no option. These were ten-acre Lloydminster drill site deals. [Tr. 36].

Nielson stated that while it was in the oil business Development drilled about 105 wells; that about 65 were producers, counting 47 in Lloydminster, leaving about 40 dry holes; that he thought they drilled 49 wells in Lloydminster. He said

that notwithstanding these figures on the number of producing wells, they definitely were not successful because too many of those wells were small, and some of the more expensive wells that they drilled turned out dry, and some of them marginal, and 47 of the 65 wells were in Lloydminster and two in LeDuc, which were 49 of the 65; that while they thought they really had a very good program, it was a disappointing program. [Tr. 37]

Nielson stated that they relied mainly on the pattern for the Development deal that was established in the JSP deal. [Tr. 51]. Nielson stated, " * * * in the main, we have purchased to operate, and we own a company to help build a company." [Tr. 48].

When asked, "You were aware at the time that you entered into these arrangements of the possible tax advantages that would accrue to Gate City Steel Company by creating a subsidiary and entering into these various kinds of transactions which we have already talked about here?" Nielson replied,

"We were aware that that was the regulations and the law, and that we were trying to operate accordingly, which I think all oil producers do." [Tr. 52].

Nielson acknowledged that at a meeting of Gate City's stockholders on February 15, 1952, he stated that the cost of 49 wells in the Lloydminster area was $20,000 per completed well, $21,000 for a dry hole, and that they were drilling under a contract whereby the cost of drilling, plus a bonus of 25 percent, would be recoverable, but stated that what he was trying to express was the least it might do under the program. [Tr. 55].

Nielson acknowledged that the operation of Development as far as the Lloydminster properties were concerned on which the Development Husky Refining option was granted was not unsuccessful. [Tr. 62].

Husky Refining's Canadian Income Tax return for period ended December 31, 1951 lists as an addition in Schedule of Expenditures Carried Forward to Years Subsequent to December 31, 1951 the "Exploratory costs acquired at time of purchase of all of the capital Stock of Rock Creek Oil Company Limited * * Less Amount Used to Reduce Taxable Income of Rock Creek Oil Company, Limited, to nil for all years." [Stip., Ex. 51].

"Casing charged to production equipment on wells of others:
"S.C.C. program $385,846.53
" * * * * * *

"Amounts actually expended by Gate City Development Company and G. E. Nielson on wells acquired by Husky Oil & Refining, Ltd.

[Note 1] $1,203,000.00.
* * * * * *
"Notes:
"[1] Exploration and drilling costs as allowed by tax department as per letter from Director General, Assessment Branch, Ottawa, dated November 4, 1952."

Husky Refining's Canadian Income Tax Return for period ended December 31, 1953 lists as an addition under "Exploratory Expenditures Carried Forward To Year Subsequent to December 31, 1953," the following: [Stip. Ex. 52].

"Casing charged to production equipment on wells of others:
"S.C.C. program $93,537.27"

Neither Development nor any of its officers ever had a license to act as a broker; it never commissioned anybody to sell properties in its behalf; it never advertised any properties; it didn't kind of let the word leak out in the trade that it might have some properties for sale. [R-40]

In Vern W. Bailey, 21 T.C. 678, 684 [1954] the court stated,

"The principal issue to be determined is whether the petitioners realized ordinary income or capital gains from the sale of undivided interests in two Texas oil and gas leases. The 'interest of a lessee in oil and gas constitutes an interest in "real property" * * * [And] if such inter-

ests were held for more than six months, except with respect to a dealer therein, they will qualify as "property used in the trade or business," as defined by section 117[j] of the Code, and they are subject to the treatment provided by that section.'

"It is respondents' contention that Bailey became a dealer in leases and made these sales in the 'course of his trade or business,' thus realizing ordinary income. Numerous tests have been employed to aid in the determination of whether property has been held by a taxpayer 'primarily for sale to customers in the ordinary course of his trade or business.' The factor which must be given greatest weight is the purpose for which the property was held during the period in question. Walter R. Crabtree, 20 T.C. 841, Carl Marks & Co., 12 T.C. 1196 (1949). This purpose must be determined from the evidence as to the intention of the taxpayer at the time of acquisition and his conduct during the holding period. * * *" It has been said:

" 'There is no fixed formula or rule of thumb' for determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business and '[e]ach case must, in the last analysis, rest upon its own facts.' No single factor or test is dispositive. Factors considered are: [1] the purpose for which the property was acquired; [2] the purpose for which it was held; [3] improvements, and their extent, made to the property by taxpayer; [4] frequency, number and continuity of sales; [5] the extent and substantiality of the transactions; [6] the nature and extent of taxpayer's business; [7] the extent of advertising to promote sales, or the lack of such advertising; and [8] listing of the property for sale directly or through brokers." Kaltreider v. Commissioner of Internal Revenue, 3 Cir., 255 F.2d 833, 838 [1958].

"In determining the tax status of real estate transactions of this kind, each case must be decided on its own facts, and so there are no ''landmark' decisions in this area. However, the Court of Appeals for this Circuit has elaborated, in numerous decisions, certain 'ground rules' to be observed by the trial court in surveying the facts. Each of the following elements of the individual case must be considered and weighed:

"1. The vocation of the taxpayer at the time of the sales or prior thereto, and its relation to the transactions in question;

"2. the number, frequency and continuity of sales;

"3. the time for which the property was held;

"4. the extent, nature and timing of taxpayer's efforts to promote sales;

"5. the extent and continuity of taxpayer's sales activities as compared with his other remunerative undertakings;

"6. the substantiality of sales income as compared with taxpayer's income from other sources.

"These are the principal points of reference which, taken in the context of the 'total fact situation,' will distinguish a speculative investment from a commercial enterprise, a bona fide liquidation of a capital asset from a sale in the ordinary course of business. The stated purposes for which the property was acquired, held, and sold must be considered in the light of, and may be qualified by, the objective facts listed above." Durr v. Usry, 163 F.Supp. 355, 356 [E.D.La.1958].

"Several well-recognized tests have been evolved by the courts in the course of deciding whether property at the time of sale is a capital asset held by the taxpayer as an investment or property held primarily for sale to customers in the

ordinary course of his trade or business. The tests include the purpose or reason for the taxpayer's acquisition of the property and in disposing of it; the continuity of sales· or sales-related activity over a period of time; the number and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of the sales when compared to other sources of taxpayer's income. Boomhower v. United States, D.C., 74 F. Supp. 997; Martin Dressen, 17 T.C. 1443; W. T. Thrift, Sr., 15 T.C. 366. However, as this Court pointed out in the Thrift case, 'No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case.' " James G. Hoover, 32 T.C. 618, 625 [1959].

Boomhower v. United States, 74 F. Supp. 997 [D.C.Ia.1947] adds the test of frequency of sales, as opposed to isolated transactions. The court in this case further stated that some courts have attached weight to the reasons for, purpose, or nature of the sale of the subject matter, but that this liquidation test, "however, has generally been rejected by a recognition that the activity of the taxpayer in disposing of the subject matter could reach the proportions of one doing business regardless of his impelling motives."

The court, in D. G. Bradley, 26 T.C. 970, 978 [1956] states that the treatment of the property in the taxpayer's records is to some extent determinative of the purpose for which the property was held during the period in question.

In Robert R. Miller ¶ 61,045, P-H Memo T.C. the court states:

" * * * While the ultimate question is the purpose for which the property was held at the time of sale, we think that under the present circumstances the property was not at any time converted into property held primarily for sale to customers.

As stated in Vern W. Bailey [21 T.C. 678, 684 (1954)] supra: 'The factor which must be given greatest weight is the purpose for which the property was held during the period in question. Walter R. Crabtree, 20 T. C. 841; Carl Marks and Co., 12 T.C. 1196 [1949]. This purpose must be determined from the evidence as to the intention of the taxpayer at the time of acquisition and his conduct during the holding period.' "

In George W. Taylor, ¶ 60,091 P-H Memo T.C. [1960] joint venturers held timber land as capital asset rather than for sale to customers in the ordinary course of business; hence they were taxable only at capital gains rates on sale. The land was not acquired primarily for profitable resale, was not generally improved and was not advertised. In any case the transaction was an isolated one and the parties were not engaged in the real estate business.

In Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 51, 76 S.Ct. 20, 24, 100 L.Ed. 29 [1955] the court stated,

"Nor can we find support for petitioner's contention that hedging is not within the exclusions of § 117 (a). Admittedly, petitioner's corn futures do not come within the liberal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103, 108 [53 S.Ct. 74, 76, 77 L.Ed. 199]. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to

relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106 [53 S.Ct. at page 75]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. See Hort v. Commissioner, 313 U.S. 28, 31 [61 S.Ct. 757, 758, 85 L.Ed. 1168]; Kieselbach v. Commissioner, 317 U.S. 399, 403 [63 S.Ct. 303, 305, 87 L.Ed. 358]."

In Rollingwood Corp. v. Commissioner of Internal Revenue, 9 Cir., 190 F.2d 263, 266 [1951] the court stated,

"While the purpose for which the property was acquired is of some weight the ultimate question is the purpose for which the property is held. Richards v. C. I. R., 9 Cir., 81 F.2d 369, 106 A.L.R. 249. Most of the cases dealing with the problem of whether property is held primarily for sale to customers in the ordinary course of trade or business involve situations where the taxpayer is engaged in some activity apart from his usual occupation and the question is whether this activity amounts to a business. The test normally applied in these situations is the frequency and continuity of the transactions claimed to result in a trade or business. * * *

" * * * Petitioners contend that the word 'primarily' means 'principal' or 'chief,' while the Commissioner contends it means 'essential' or 'substantial.' For reasons hereinafter stated we think the latter view is more consonant with the legislative policy.

* * * * * *

"The capital gains provisions are remedial provisions. Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time from having the profits from sales taxed at graduated tax rates designed for a single year's income. The purpose is to protect 'investment property' as distinguished from 'stock in trade,' or property bought and sold for a profit. It is our view that this policy was not meant to apply to a situation where one of the essential purposes in holding the property is *sale*.

* * * * * *

" * * * In the instant case we have frequent and periodic sales commencing in the first fiscal year that the project was in existence and continuing throughout the entire period in question. * * *

"Viewing the activities of petitioners in light of the legislative purpose and policy we are of the opinion that the Tax Court did not err in concluding that the houses in question were held by Rollingwood primarily for sale to its customers in the ordinary course of its trade or business and that the gain from the sales thereof should be taxed as ordinary income. * * * "

In Raymond Bauschard, 31 T.C. 910 [1959] petitioner was pastor of a parish located in a residential community. The residents of that community learned of a plan to build a low-cost housing development on a tract of unimproved land some three-quarters of a mile from the site of petitioner's parish buildings. A civic committee was organized to devise a means of preventing its erection. Thereafter, petitioner and Edward Tonti, a real estate developer and close friend, discussed acquisition of the property. In October 1951, petitioner and Harry Haney purchased the land for $77,000, of which petitioner furnished two-thirds, and it was taken in trust for them. The land was then leased to Tonti for 5 years, it being understood that he intended to

plat, subdivide, and improve it. He was authorized to sell any lot thereon in his own name however was to pay the trust a stipulated price for any lot so sold. A corporation controlled by Tonti was organized, and proceeded to plat, subdivide, improve, and sell the property. During 1952, 1953, and 1954, all except 14 lots were sold to builders. The court held that petitioner and Tonti joined together in the creation of a joint venture to undertake the purchase, development, and sale of the property, and that the lots sold during 1952, 1953 and 1954 were held by petitioner primarily for sale to customers in the ordinary course of business, and the gains realized thereon represented ordinary income. The court found that petitioner decided to purchase the tract, and, while his primary objective was to prevent the erection of the low cost housing project, he also expected a profitable return on his money.

The court stated,

"* * * The issue confronting us here is whether petitioner's activities with respect to the purchase, development, and sale of the Snider tract were of such a nature as to constitute a trade or business. As we have often said, this is a question of fact.

"Petitioner's argument is a simple one. He submits that he acquired the property primarily to protect his parish from deterioration due to the encroachment of substandard dwellings; that he sold it in order to realize that objective by securing high-grade homes in the area, and that neither he nor his trustee was in the business of selling lots to customers. He contends a single contract of sale was entered into which was consummated at various times by the transfer of property to Tonti's nominees, none of whom was his or his trustee's customer. * *

"Among the many tests which the courts have indicated are helpful in deciding whether property is held by a taxpayer as a capital asset or for sale to customers in the ordinary course of business are: The purpose for which the property was originally acquired, the activities of the seller, or those acting either with him or on his behalf, with respect to the improvement and actual disposition of the land; the frequency and continuity of sales; and the purpose for which the property was held during the taxable years.

"Equally material to a proper consideration of the question is a recognition of the fundamental objective of the capital gain provisions of the Code; this is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income, thus easing the tax burden which might otherwise result upon the sale of a capital investment. Inasmuch as these provisions constitute an exception to the normal tax requirements of the Code, they are to be narrowly construed. * * *

"* * * Since there is no contention that the activities carried on by Tonti and the corporation did not constitute a trade or business, we have concluded that the petitioner was similarly engaged during the years in issue. * * *

"* * * the income here was petitioners, and its character for tax purposes * * * was determined by the activities which produced it, and not by petitioner's vocation or position in the community. Since we think the activities herein involved definitely constituted a trade or business, and are attributable to petitioner as a member of the joint undertaking, the income arising therefrom must be taxed at ordinary rates.

"With respect to petitioner's contention that the property was acquired solely to protect the community, a final observation is pertinent. It has often been held that though the underlying purpose of the acquisi-

tion is to be given consideration, that purpose is necessarily subject to change. „Where such has been the case, the original purpose gives way to the purpose for which the particular property is held at the time of its sale. Mauldin v. Commissioner, 195 F.2d 714 [C.A.10, 1952] affirming 16 T.C. 698 [1951]. We believe that principle has proper application here. Petitioner's original interest in the property undoubtedly arose because of his wish to protect the community. However, once matters had progressed to the point of acquisition of the property, that interest had been served, and another took its place; namely, the means of profitably disposing of the acquired land, albeit at the same time serving the original purpose. Further, the record indicates that the profit motive was always present, and thus was part of a dual purpose underlying the original acquisition." Raymond Bauschard, supra, was affirmed by Bauschard v. C. I. R., 6 Cir., 279 F.2d 115 [1960].

In Pennroad Corporation, 29 T.C. 914 [1958] it was the position of the petitioner that the parcels of real estate sold by Canton during the taxable years were capital assets, within the meaning of § 117[a] I.R.C.1939, or assets used in Canton's trade or business within the meaning of § 117[j], the gains from the sale of both of which are entitled to capital gains treatment under the statute.

The court stated,

"That Canton was engaged in the business of selling real estate to customers in the ordinary course of its operations, is, we think, abundantly clear from the evidence and the facts found therefrom."

In Pennroad Corp. v. Commissioner of Internal Revenue, 3 Cir., 261 F.2d 325, 328 [1958] the court stated,

"Taxpayer characterizes Canton's activities as evidencing a gradual, passive liquidation of its original real estate holdings purchased over one hundred years ago. It concludes that the real estate Canton sold during the tax years was either a capital asset under Section 117[a], or property used by it in its trade or business under Section 117[j] of the Internal Revenue Code of 1939.

"That property is being liquidated does not foreclose the question, for as was said in Home Co., Inc., v. Commissioner of Internal Revenue, 10 Cir., 1954, 212 F.2d 637, 641:

"'One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and sale in the ordinary course of such a business and the preferred tax status is lost.'

\*　　\*　　\*　　\*　　\*

"Accordingly, since the activities of Canton, culminating in the sales in question, were carried forward with such purpose, system, and continuity, we are persuaded that the sales were to customers in the ordinary course of its business."

In Greene-Haldeman v. C. I. R., 9 Cir., 282 F.2d 884, [1960] the court held that where corporate automobile dealer, during period when automobiles were in unusual demand, engaged in the rental of automobiles for various periods prior to their sale as used automobiles, long-term rental contracts included an option to purchase by lessee, and because of expanded rentals, dealer received more automobiles from manufacturer than it otherwise would have received, the automobiles were held primarily for sale in the ordinary course of business, and the profit on such sales was taxable as ordinary income and was not entitled to preferential capital gains treatment.

The court stated,

" * * * The inference the Commissioner wanted the Tax Court to draw, and which the Tax Court apparently drew, from the above state of facts was that the taxpayer through its 'long-term rental with option to purchase plan' was really operating a 'credit purchase plan' under a different name, and that one of the taxpayer's primary motives in obtaining autos for short-term rentals was for subsequent sale, and therefore the taxpayer held them 'primarily for sale to customers in the ordinary course of his trade or business.' "

* * * * * *

" * * * The specific question presented for determination is: Did the Tax Court err in determining that the above-described rental vehicles owned by the taxpayer were held 'primarily for sale to customers in the ordinary course of his trade or business' within the meaning of Section 117[a] and [j] of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117[a], [j]?

* * * * * *

" * * * taxpayer argues that error was committed to the extent the purpose for which the property was held *at the time of sale* influenced the decision of the Tax Court. The Tax Court concluded that the taxpayer 'acquired, held and sold the rental cars with the primary, essential, substantial and determining business purpose of selling them to its customers in the ordinary course of its business.' This language, in our opinion, does nothing more than indicate that the taxpayer had as one of its primary purposes the ultimate sale of these cars to its customers in the ordinary course of its business at the time it acquired the property, and that this intention continued, unaltered, while the cars were being rented and later held until customers purchased them.

The language of the Tax Court does no more than demonstrate a continuous purpose as opposed to those situations where a taxpayer may acquire property for one purpose and later hold, use or dispose of it for another purpose. In fact, in the course of the Tax Court's opinion it is stated '[taxpayer's] acquisition, holding and sale of these rental automobiles were accompanied by the everpresent motive of ultimately selling them at retail for profit.'

" * * * The extent of sales activity on the part of the taxpayer is relevant to the issue of whether the taxpayer is holding these vehicles for a primary purpose other than rental. * * * its active engagement in prosecuting the sale of former rental vehicles is one factor which is relevant in determining if it is holding such vehicles primarily for the purpose of sale to customers in the ordinary course of its trade or business. * * *

" * * * the language of Section 117[j] contemplates that depreciable property used in a business *may* also be held primarily for sale * * * where the depreciable articles, after having been used, are actively sold on a frequent and recurrent basis and in such a manner that it could be concluded that a primary purpose for which they were held was sale to customers in the ordinary course of a trade or business. Indeed, the use of the word 'primarily' in Section 117[j] [1] [B] itself indicates that the property sold could have been held for more than one purpose. * * * "

The annotation, "Federal income tax: when property is deemed to be held primarily for sale to customers in ordinary course of trade of business" appears in 46 A.L.R.2d 615.

The annotation, "Federal income tax: when real estate is deemed to be held primarily for sale to customers in ordi-

nary course of trade or business" appears in 46 A.L.R.2d 767.

We are confronted with the question of whether Development realized ordinary income or capital gain from the sale of LeDuc and Lloydminster properties. Excluded from the definition of both "capital assets" and "property used in the trade or business" is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. [I.R.C. 1939] § 117[a] [1] and [j] [1].

We are concerned with § 117[j] [1].

■■ Development was organized in October, 1950. By agreement of August 23, 1951 Development acquired the LeDuc property. Development sold the LeDuc property to Husky Refining by agreement dated July 3, 1952, to be effective June 1, 1952. The agreement between Development and Husky Refining was initially dated August 18, 1951. By agreement of August 11, 1952 and conveyance dated August 8, 1952 Husky sold these properties to Husky Refining. By agreement dated September 30, 1953 Development sold all of the oil and gas properties it owned to Husky. In 1954 Development changed its objects and purposes to those of Gate City Steel Works, Inc. Development's intangible drilling costs were fully deducted by the Gate City Steel group. The amount of the developmental costs which had been deducted by Development were again available for deduction in Canada. The taxes of Gate City Steel were greatly decreased by reason of losses attributable to Development. Husky Refining retained an option to purchase the Lloydminster properties. Because of the clear advantage to the Nielson group of holding these properties in a United States corporation, we hold that a substantial purpose in Development's holding these properties was for sale to customers. We are not overlooking the evidence herein tending to show that it was Development's purpose to build an oil company. Nonetheless we conclude that Development also had an ever present primary purpose of selling the property to one or more of the Nielson group's corporations with intention of saving taxes in the over-all Nielson operation. Development appears to have held the LeDuc and Lloydminster properties for sale with no other intention than to save taxes. But can the carrying out of this plan to save taxes be considered a taxpayer's trade or business? We think not. Therefore the Commissioner erred in determining that these properties were held for sale in the ordinary course of the taxpayer's trade or business.

The foregoing shall constitute the Court's findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure. Judgment will be in favor of the plaintiff. Counsel for plaintiff will prepare and submit a form of judgment within fifteen [15] days.